**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **IN RE EQUIFAX INC. SECURITIES LITIGATION** | Consolidated Case No. 1:17-cv-03463-TWT |

**MEMORANDUM OF LAW IN SUPPORT**
**OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT.................................................................1

II.  ARGUMENT .................................................................................6

    A.   The Proposed Settlement Warrants Final Approval ...................................6

        1.   Lead Plaintiff and Lead Counsel Have Adequately
           Represented the Class...............................................................7

        2.   The Settlement Was Reached Following Substantial Discovery and
           Arm's-Length Negotiations with an Experienced Mediator.................8

        3.   The Settlement Should be Approved in Light of the Costs
           and Risks of Further Litigation..................................................9

        4.   The Settlement Treats Class Members Equitably
           Relative to Each Other...........................................................20

        5.   Other Factors Considered by the Eleventh Circuit
           Support Approval of the Settlement ........................................21

    B.   The Plan of Allocation is Fair and Reasonable.......................................22

    C.   The Settlement Class Should be Certified ............................................24

    D.   Notice Satisfies Rule 23 and Due Process ............................................24

III. CONCLUSION ............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Bank Note Holographies, Inc., Sec. Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...................................................16

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) ................................................6, 10, 21

*In re Biolase, Inc. Sec. Litig.*,
  2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ..................................17

*Canupp v. Sheldon*,
  2009 WL 4042928 (M.D. Fla. Nov. 23, 2009).......................................9

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
  2008 WL 11336122 (N.D. Ga. Oct. 20, 2008)....................................16

*In re Chicken Antitrust Litig. Am. Poultry*,
  669 F.2d 228 (5th Cir. 1982) ...............................................................22

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)...............................................................................14

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ...............................7, 8, 9

*Faught v. Am. Home Shield Corp.*,
  668 F.3d 1233 (11th Cir. 2012) .............................................................7

*Francisco v. Numismatic Guar. Corp.*,
  2008 WL 649124 (S.D. Fla. Jan. 31, 2008)........................................22

*In re HealthSouth Corp. Sec. Litig.*,
  572 F.3d 854 (11th Cir. 2009) ...............................................................6

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018).....................................20

*Ingram v. The Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001) .......................................................................9

*Kirkpatrick v. J.C. Bradford Co.*,
    827 F.2d 718 (11th Cir. 1987) .........................................................................8

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) .................................................17

*Vinh Nguyen v. Radient Pharms. Corp.*,
    2014 WL 1802293 (C.D. Cal. May 6, 2014) ...................................................22

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
    396 F.3d 96 (2d Cir. 2005) .............................................................................24

*Yang v. Focus Media Hold'g*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ...................................................22

## STATUTES AND RULES

15 U.S.C. § 78u-4(a)(7) ..........................................................................................25

Fed. R. Civ. P. 23 ............................................................................................passim

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff Union Asset Management Holding AG ("Lead Plaintiff" or "Union"), on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of: (1) the proposed settlement resolving all claims in the Action for $149 million in cash for the benefit of the Settlement Class (the "Settlement"), and (2) the proposed plan of allocation for distribution of the proceeds of the Settlement (the "Plan of Allocation").[1]

## I.    PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in the Action in exchange for a cash payment of $149 million, which has been deposited into an escrow account.  Lead Plaintiff respectfully submits that the proposed Settlement is an outstanding result for the Settlement Class and satisfies the standards for final approval under Rule 23(e)(2) of the Federal Rules of Civil Procedure.  As detailed in the accompanying Harrod Declaration and summarized

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated February 12, 2020 (the "Stipulation") or in the Declaration of James A. Harrod in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Harrod Declaration" or "Harrod Decl."), filed herewith.  Citations to "¶ __" in this memorandum refer to paragraphs in the Harrod Declaration and citations to "Ex. __" refer to exhibits in the Harrod Declaration.

herein, the Settlement was reached after a mediation process overseen by a former federal judge, who is an experienced class action mediator, and represents a substantial percentage of the likely maximum potential damages. If approved, this Settlement would be the largest securities class action recovery in the Northern District of Georgia, and the fourth largest in the history of the Eleventh Circuit.

The Settlement is particularly favorable considering the substantial risks of continued litigation. As discussed below and in the Harrod Declaration,[2] there was a real risk that Lead Plaintiff would be unable to prove that Defendants committed securities fraud. Lead Plaintiff faced substantial risks in its efforts to prove falsity, scienter, loss causation and damages. For example, Defendants would have continued to argue that Equifax was expending significant effort and money on its cyber-defenses, which made their statements regarding cybersecurity true. ¶ 93. Defendants would have also continued to argue that certain alleged misstatements were "puffery"—immaterial statements of corporate optimism—that could not

---

[2] The Harrod Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for detailed descriptions of, *inter alia*: the nature of the claims asserted in the Action (¶ 18); the history, prosecution, and settlement of the Action (¶¶ 19-81); the risks and uncertainties of continued litigation of Action (¶¶ 82-112); and the proposed Plan of Allocation (¶¶ 122-130).

trigger liability, and that others were not directed at investors and did not satisfy the "in connection with" requirement for securities fraud claims.  ¶¶ 90-92.

Lead Plaintiff would have also faced significant hurdles in proving that Defendants acted with the requisite level of intent or recklessness—scienter—to commit securities fraud.  For example, in addition to pointing to Equifax's cybersecurity efforts, Defendants would have argued that the lack of evidence directly linking Defendant Smith (or other "C-Suite" executives) to knowledge of Equifax's cybersecurity problems, would make it impossible for Union to carry its burden of proof on scienter.  ¶¶ 97-100.

Finally, Lead Plaintiff would have encountered substantial challenges in proving in proving "loss causation"—that the alleged misstatements were the cause of investors' losses—and in establishing damages.  Among other things, Defendants would have continued to argue that the alleged corrective disclosures could not establish loss causation because all, or at least a significant portion of, the declines in the price of Equifax's common stock reflect investors' reaction to the expected cost and impact of the Data Breach itself, rather than the revelation of alleged undisclosed cybersecurity deficiencies.  ¶¶ 103-105.  Furthermore, Defendants would have continued to argue for a shortened Class Period, which, if successful, would have wiped out more than half of the potential aggregate damages and

severely limited the definition of the Class.  ¶ 102.

In light of these risks, Lead Plaintiff and Lead Counsel believe that the recovery of $149 million for the Class is an excellent result.  Lead Plaintiff's damages expert estimates, after giving effect to certain of Defendants' arguments, that the *maximum* potential damages that could be realistically proven at trial in this Action were approximately $588 million.   Accordingly, the $149,000,000 Settlement represents approximately 25% of the realistic maximum recoverable damages—multiples of the typical of recovery in comparable securities actions.

In addition, at the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action.  Before the Settlement was agreed to, Lead Counsel had, among other things:  (i) conducted a comprehensive investigation into the claims asserted in the Action; (ii) researched and drafted the detailed 186-page Consolidated Class Action Complaint (the "Complaint"); (iii) defeated, in significant part, Defendants' motion to dismiss the Complaint; (iv) successfully opposed Defendants' subsequent motions further challenging the Complaint and seeking appellate review of the Court's motion to dismiss opinion; (v) fully briefed the motion for class certification, including related discovery of Union and both sides' experts; (vi) engaged in substantial discovery, which included obtaining and reviewing over 1 million pages

4

of documents from Defendants and third parties; (vii) consulted with experts regarding loss-causation, damages, and cybersecurity issues; and (viii) engaged in months of extensive settlement negotiations and mediation under the auspices of U.S. District Court Judge Layn R. Phillips. ¶¶ 19-79.

Absent the Settlement, the Parties faced the prospect of protracted litigation through the remainder of fact discovery; costly expert discovery; summary judgment; a trial; post-trial motion practice; and likely ensuing appeals. ¶ 8. The Settlement avoids these risks and delays while providing a substantial, certain, and immediate benefit to in the form of a $149 million cash payment.

In light of these considerations, Lead Plaintiff and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiff requests that the Court approve the proposed Plan of Allocation, which was set forth in the Notice mailed to potential Class Members. The Plan of Allocation, developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, provides a reasonable method for allocating the Net Settlement Fund among Class Members who submit valid claims based on damages they suffered that were attributable to the alleged fraud.

## II.    ARGUMENT

### A.    The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims.  *See* Fed. R. Civ. P. 23(e).  A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  The Eleventh Circuit has recognized that public policy favors settlement, particularly in class actions.  *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial settlement of class action lawsuits.").

Rule 23(e)(2) provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  The Eleventh Circuit has held that district courts should also consider following factors set forth in *Bennett v. Behring Corp.*:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a

> settlement is fair, adequate and reasonable; (4) the complexity, expense
> and duration of litigation; (5) the substance and amount of opposition
> to the settlement; and (6) the stage of proceedings at which the
> settlement was achieved.

737 F.2d 982, 986 (11th Cir. 1984); *accord Faught v. Am. Home Shield Corp.*, 668

F.3d 1233, 1240 (11th Cir. 2012).[3]

Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and

adequacy of the Settlement principally in relation to the four factors set forth in Rule

23(e)(2), but will also discuss the application of relevant, non-duplicative *Bennett*

factors. *See In re Equifax Inc. Customer Data Sec. Breach Litig*., 2020 WL 256132,

at *10 (N.D. Ga. Mar. 17, 2020) ("*Equifax Data Breach"*) (reviewing final approval

of class action settlement under both the Rule 23(e)(2) factors and *Bennett* factors).

All of the applicable factors strongly support approval of the Settlement.

### 1.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

In evaluating a class action settlement, the Court should consider whether "the

class representatives and class counsel have adequately represented the class." Fed.

R. Civ. P. 23(e)(2)(A). Courts consider (1) whether class representatives have

---

[3] The Advisory Committee Notes to the 2018 amendments to the Federal Rules of
Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended
to "displace" any factor previously adopted by the Court of Appeals, but "to focus
the court and the lawyers on the core concerns of procedure and substance" to
evaluate settlement approval. Advisory Committee Notes to 2018 Amendments.

interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation. *See, e.g.*, *Kirkpatrick v. J.C. Bradford Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *Equifax Data Breach*, 2020 WL 256132, at *5.

Here, Lead Plaintiff and Lead Counsel have adequately represented the Class in both their vigorous prosecution of the Action for more than two years and in the arm's-length negotiation of the Settlement. Lead Plaintiff has claims that are typical of and coextensive with those of other Class Members, and has no interests antagonistic to the interests of other members of the Settlement Class. In addition, Lead Counsel is highly qualified and experienced in securities litigation (*see* BLB&G Firm Resume, Ex. 3A-3) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.

Accordingly, the Class was adequately represented.

### 2.   The Settlement Was Reached After Substantial Discovery and Arm's-Length Negotiations

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).[4] The Settlement here was reached only after extensive arm's-length

---

[4] This inquiry is comparable to the Eleventh Circuit's traditional threshold examination of whether a proposed settlement is the product of fraud or collusion

negotiations between experienced counsel, which included a full-day mediation session with retired federal judge Layn R. Phillips, an experienced mediator of securities class actions and other complex litigation, and months of subsequent negotiations. ¶¶ 75-79. This clearly supports approval of the Settlement. *See Equifax Data Breach*, 2020 WL 256132, at *6 ("readily conclud[ing]" that a settlement was negotiated at arm's-length where mediation was conducted by Judge Phillips, "a retired federal judge with a wealth of experience in major complex litigation"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (involvement of experienced mediator points to "absence of collusion").

### 3.    The Settlement Should be Approved in Light of the Costs and Risks of Further Litigation

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). In most cases, this will be the most important factor for the Court to

---

between the parties. *See Canupp v. Sheldon*, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009) (Courts should examine whether settlements are "achieved in good faith through arms-length negotiations" are "the product of collusion between the parties and/or their attorneys," or involve "unethical behavior or want of skill or lack of zeal on the part of class counsel.").

consider in analyzing the proposed settlement.[5]

Here, the Settlement Amount—$149 million in cash—represents a significant recovery. If approved, this Settlement would be the largest securities class action recovery in this District and the fourth largest securities class action recovery in the history of the Eleventh Circuit. Moreover, the $149 million Settlement is approximately *23 times* the size of the median securities class action settlement in the Eleventh Circuit between 2010 and 2019 ($6.3 million, inflation adjusted). *See* Cornerstone Research, Securities Class Action Settlements 2019 Review and Analysis (2020), at 20 (Ex. 6) ("Cornerstone Report").

More importantly, the Settlement provides a substantial financial benefit while eliminating the significant risk that the Settlement Class could recover less, or nothing at all, if the Action continued. As discussed in detail in the Harrod Declaration and below, continued litigation of the Action presented several risks that Lead Plaintiff would be unable to establish liability and damages. ¶¶ 82-112. In addition, continuing the litigation through trial and appeals would impose substantial additional costs on the Settlement Class and would result in extended delays before

---

[5] Indeed, this factor under Rule 23(e)(2)(C) encompasses four of the six factors of the traditional *Bennett* analysis: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; [and] (4) the complexity, expense and duration of litigation." 737 F.2d at 986.

any recovery could be achieved. The Settlement avoids those further costs and delays. Moreover, the Settlement represents a substantial percentage of the maximum damages that could be realistically established at trial, and thus represents a very favorable outcome in light of the litigation risks. ¶¶ 6, 113-114. All of these factors strongly support approval of the Settlement.

### (a)   The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented a number of substantial risks to establishing both liability and damages.

### (i)   Risks To Proving Liability

As detailed in the Harrod Declaration, Lead Plaintiff's core allegation in the Action was that Defendants violated the federal securities laws by making materially false and misleading statements about Equifax's commitment to cybersecurity and compliance with applicable industry standards and regulations. In the absence of the Settlement, Lead Plaintiff would have faced substantial challenges in proving both falsity and scienter.

For example, Defendants have argued that the fact that Equifax's data security defenses were overcome by sophisticated cybercriminals does not establish that the Defendants' statements were false or misleading. In support of their position,

11

Defendants have argued, and would have continued to argue, that Equifax expended significant effort and money on cyber-defenses, which made their statements regarding cybersecurity true. ¶ 93. Essentially, Defendants would argue that they were victimized by sophisticated criminal attack that they could not have predicted.

Defendants would have also continued to argue that their alleged misstatements about Equifax's commitment to cybersecurity were immaterial "puffery"—vague, generalized statements of corporate optimism—that do not state a Section 10(b) claim. ¶¶ 90-92. There was a significant risk that, had the litigation continued to trial, a jury could have found that these statements about Equifax's cybersecurity were too vague or general to trigger liability for fraud.

Additionally, Lead Plaintiff faced a real risk that it would be unable to prove its allegation that Defendants' statements about the Company's data security standards and practices, and failure to disclose purported internal mismanagement of those standards and practices, were materially false and misleading. Defendants would have continued to argue, that, as a matter of law, Defendants' purported internal mismanagement and failure to disclose such mismanagement does not constitute securities fraud. ¶ 94-95. Thus, Defendants would argue, and a jury could find, that Plaintiff's theory of falsity for both the "commitment" and the

"compliance" statements amounted to claims of corporate mismanagement, not securities fraud. *See id.*

Furthermore, Defendants would have continued to argue that Defendant Smith's August 2017 statements at a business school breakfast and the statements on Equifax webpages regarding the Company's cybersecurity were not directed to investors and do not satisfy the "in connection with" the purchase or sale of securities element needed to support a Section 10(b) claim. ¶ 96.

Thus, there were several significant risks attendant to proving that Defendants' alleged misstatements were materially false and misleading.

Even if Lead Plaintiff succeeded in proving falsity, Union would have faced significant risks in proving that Defendants acted with scienter—the intent to mislead investors or a severely reckless indifference to the truth. First, Defendants would present evidence that the Company invested significantly in cybersecurity and had in place a reasonable overall cybersecurity program. Such evidence could have undermined a conclusion that Defendants' alleged misleading statements about Equifax's commitment to cybersecurity were made with any intent to deceive. ¶ 100. Second, Defendants would point to the lack of direct and clear evidence that Equifax executives at the C-Suite level (specifically including Defendant Smith) had knowledge of the Company's cybersecurity deficiencies. ¶¶ 98-99. This argument

13

was potentially even stronger for the portion of the Class Period prior to March 2017, when Defendant Smith allegedly learned of the Company's deficiencies. ¶¶ 49, 102. That point, particularly when combined with evidence of Equifax's genuine efforts and investment on cybersecurity, could preclude a finding that Defendant Smith, and through him, Equifax, intentionally or recklessly misled investors about the Company's compliance with data security standards or regulations.

In sum, Defendants would present a case that Equifax was making significant efforts on cybersecurity and no one responsible for the alleged false statements had knowledge of the deficiencies or alleged compliance failures, making the alleged false statements reasonable, or at worst, negligent. These arguments and evidence presented a significant risk that Plaintiff would be unable to prove scienter.

### (ii)    Risks To Proving Damages and Loss Causation

Even assuming that Lead Plaintiff overcame the above risks and successfully established liability, Lead Plaintiff would have confronted considerable additional challenges in establishing loss causation and damages. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'"). While Defendants raised the issue of loss causation in their motion to dismiss and the Court rejected that argument, the threshold for alleging loss

causation at the pleading stage is not onerous, and these arguments could have been presented with more force at summary judgment and trial where Defendants' position would have been supported by expert testimony opining that there was *no* loss causation, and limited or no damages. ¶ 107-108. Risks related to loss causation and damages were an important driver of the settlement value of this case. *Id.*

Defendants have argued and would continue to argue that the Class Period should start later, in March 2017, and end earlier, on September 7, 2017. According to Defendants, the Class Period should start (if at all) in March 2017 (rather than in February 2016) when Defendants are alleged to have received a report from an outside consulting firm (Mandiant) making certain observations regarding aspects of Equifax's cybersecurity program. ¶¶ 102. Defendants also claim that the Class Period should end on September 7, 2017, the date of Equifax's initial disclosure of the Data Breach, not September 15, 2017, because the alleged corrective disclosures made after the initial disclosure of the Data Breach did not disclose anything new to the market beyond what was revealed on September 7, 2017. *Id.*

Moreover, Defendants would have continued to argue that Lead Plaintiff would not be able to disentangle the effect of information unrelated to the alleged fraud that the market learned on the same days as the alleged corrective disclosures. For example, Defendants argued that a significant portion of the declines in

15

Equifax's stock price on the corrective disclosure dates reflect investors' reaction to the expected cost and impact of the data breach itself rather than the revelation of undisclosed cybersecurity deficiencies. ¶¶ 103-105. Similarly, Defendants have argued that the data breach was the materialization of a publicly-disclosed risk that Equifax's systems could be breached, and that Lead Plaintiff and members of the Settlement Class would not be able to measure the effects of that "materialization" on a class wide basis. ¶ 106. If Defendants prevailed on any of their loss causation arguments, damages would be eliminated or significantly reduced. ¶¶ 104, 107-108.

These disputed issues would have boiled down to a "battle of experts" at trial. Defendants would have presented a well-qualified expert who would opine that the Class's damages were small or nonexistent. As Courts have long recognized, the uncertainty as to which party's expert's view might be credited by the jury presents another substantial litigation risk in securities actions. *See Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 11336122, at *8 (N.D. Ga. Oct. 20, 2008) ("The reaction of a jury to such expert testimony is highly unpredictable and . . . 'a jury could be swayed by experts for Defendants', and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs contended"). (quoting *In re Am. Bank Note Holographies, Inc., Sec. Litig.,* 127 F. Supp. 2d 418, 426-427 (S.D.N.Y. 2001)

### (b)    The Settlement Represents a Substantial
### Percentage of Likely Recoverable Damages

The $149 million Settlement is also a very favorable result when considered in relation to the maximum damages that could be established at trial. Lead Plaintiff's expert estimates, after giving effect to certain of Defendants' arguments, that the maximum potential damages that could be realistically established at trial in this Action were approximately $588 million. Accordingly, the $149 million Settlement represents approximately 25% of the realistic maximum recoverable damages if Lead Plaintiff were successful at trial. ¶¶ 113-114.

This recovery is many multiples above the typical percentage recovery in securities class actions. For example, one study has found that, from 2010 to 2019, in all securities class actions where damages were estimated to be in the range of $500–$999 million, the median settlement recovery was only 3.7% of damages. *See* Cornerstone Report at 6. Courts routinely approve, and even laud, settlements with substantially lower percentage recoveries than here. *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving securities class action settlement representing "5.5% of maximum damages and 10% of the most likely damages" and referring to this as an "excellent" recovery); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015)

17

(settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").

### (c)  The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays required before any recovery could be obtained through litigation also strongly support approval of the Settlement.

While this case settled after Lead Plaintiff's class certification motion was fully briefed and substantial document discovery had occurred, achieving a litigated verdict in the Action would have required substantial additional time and expense. In the absence of the Settlement, achieving a recovery for the Settlement Class would have required: (i) the conclusion of fact discovery (including numerous depositions); (ii) conducting complex and expensive expert discovery; (iii) briefing an expected motion for summary judgment; (iv) a trial involving substantial fact and expert testimony; and (v) post-trial motions.  Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict.  Even assuming success at all these stages, they would pose substantial expense and delay.

In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain recovery of $149 million for Settlement Class Members.

18

### (d)    All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports approval here.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation. Here, the proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Court-appointed Claims Administrator, JND Legal Administration ("JND"). JND, an independent company with extensive experience handling the administration of securities class actions, will review and process the Claims, will provide Claimants with an opportunity to cure any deficiencies in their Claims or request review by the Court, and will then mail or wire eligible Claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court. This is the standard method in securities class actions and has long been found to be effective.

Second, the relief provided for the Class in the Settlement is also adequate when the terms of the proposed award of attorneys' fees are taken into account. As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 20% (net of Court-awarded Litigation Expenses), are reasonable in light of the efforts of Lead Counsel and the risks in the litigation. Most importantly, approval of attorneys' fees is entirely separate from approval of the Settlement, and no party has the right to terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 16.

Lastly, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement is the Parties' confidential Supplemental Agreement, which defines Equifax's right to terminate the Settlement if the number of Class Members who request exclusion exceed a certain threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement. *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018).

### 4. The Settlement Treats Class Members Equitably Relative to Each Other

As discussed in Part II.B., the Plan of Allocation provides that class members whose claims are approved by the Court will receive their *pro rata* share of the

20

recovery based on their transactions in Equifax stock.  Lead Plaintiff will receive the same level of *pro rata* recovery (based on the Plan of Allocation) as all other Class Members.  This ensures equitable treatment among the Settlement Class.

### 5. Other Factors Considered by the Eleventh Circuit Support Approval of the Settlement

Other factors considered by the Eleventh Circuit, including the reaction of the Settlement Class to the Settlement and the stage of proceedings at which the Settlement was achieved, *see Bennett*, 737 F.2d at 986, also support approval of the Settlement.  Under the Preliminary Approval Order, the deadline for Class Members to exclude themselves from the Settlement Class or object to the Settlement is June 5, 2020.  To date, two requests for exclusion and one objection to the proposed Settlement (ECF No. 171) have been received.[6]  Lead Plaintiff will file a reply by June 19, 2020 addressing all requests for exclusion and objections received.

The stage of proceedings at which the Settlement was achieved also supports its approval.  Here, as discussed above and in the Harrod Declaration, the Settlement was reached after two-years of extensive, hard-fought litigation.  ¶¶ 19-79.  As a result, "Class Counsel had sufficient information to adequately evaluate the merits

---

[6] The sole objection was submitted jointly by two individuals who, based on their own contentions, are not members of the Settlement Class.

of the case and weigh the benefits against further litigation." *Francisco v. Numismatic Guar. Corp.*, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008).

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

### B.    The Plan of Allocation is Fair and Reasonable

Like a settlement, a plan of allocation for distribution of the settlement must be "fair, adequate and reasonable" and not collusive. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). A plan of allocation need not be precise, but will be found fair and reasonable where there is a "rough correlation" between class members' injuries and the settlement distribution. *Id.* at 240; *see Vinh Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[a]n allocation formula need only have a reasonable, rational basis"). Courts give great weight to the opinion of experienced counsel in evaluating plans of allocation. *See Yang v. Focus Media Hold'g*, 2014 WL 4401280, at *9 (S.D.N.Y. Sept. 4, 2014).

The proposed Plan of Allocation, which was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members. In developing the Plan, Lead Plaintiff's damages expert calculated, on a daily basis, the estimated amount of artificial inflation in the price of Equifax common stock that was

proximately caused by Defendants' alleged misleading statements. The daily inflation amounts were estimated by considering the price changes in Equifax common stock in reaction to the alleged corrective disclosures, controlling for price changes that were attributable to market or industry forces and information unrelated to Lead Plaintiff's allegations. Those inflation amounts were further adjusted to account for the strength of Lead Plaintiff's claims, including potential difficulties in proving liability or loss causation. *See* Notice ¶¶ 56-57.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each documented purchase or acquisition of Equifax common stock during the Class Period listed in the Claim Form. Notice ¶ 60. In general, the Recognized Loss Amount will be the lesser of the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase and sale price of the stock. *Id.* ¶¶ 59, 61.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as result of the alleged misconduct. ¶¶ 128-129. To date, no objections to the proposed Plan of Allocation have been received. ¶ 130.

### C.    The Settlement Class Should be Certified

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class.  As detailed in Lead Plaintiff's brief in support of preliminary approval, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  *See* ECF No. 159-1 at 20-25; *see also* Preliminary Approval Order (ECF No. 163) at ¶¶ 2-3 (finding that the Court will likely be able to certify the Settlement Class).  None of the facts regarding certification of the Settlement Class have changed since Lead Plaintiff submitted its motion for preliminary approval, and there has been no objection to certification.  Accordingly, Lead Plaintiff respectfully requests that the Court certify the Settlement Class under Rules 23(a) and (b)(3).

### D.    Notice Satisfies Rule 23 and Due Process

The Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The Notice also satisfies Rule 23(e)(1), requiring that it "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005).

24

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, JND began mailing copies of the Notice and Claim Form to potential Class Members on March 24, 2020. *See* Ex. 2, Segura Decl. ¶¶ 3-4. As of May 21, 2020, JND had disseminated 82,713 copies of the Notice Packet to potential Class Members and nominees. *See id.* ¶ 6. In addition, Lead Counsel caused the Summary Notice to be published in the *Wall Street Journal* and over the *PR Newswire* on April 2, 2020. *See id.* ¶ 8. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by publication in a widely-circulated newspaper and over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

## III.    CONCLUSION

Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: May 22, 2020                    Respectfully submitted,


                                       */s/ James A. Harrod*

                                       James A. Harrod
                                       (admitted *pro hac vice*)
                                       Abe Alexander
                                       (admitted *pro hac vice*)
                                       **BERNSTEIN LITOWITZ BERGER
                                       & GROSSMANN LLP**
                                       1251 Avenue of the Americas
                                       New York, New York 10020
                                       Telephone: (212) 554-1400
                                       Facsimile: (212) 554-1444
                                       jim.harrod@blbglaw.com
                                       abe.alexander@blbglaw.com

                                       *Counsel for Lead Plaintiff*
                                       *Union Asset Management Holding AG*
                                       *and Lead Counsel for the Class*

                                       H. Lamar Mixson
                                       Georgia Bar No. 514012
                                       Amanda Kay Seals
                                       Georgia Bar No. 502720
                                       **BONDURANT MIXSON &
                                       ELMORE LLP**
                                       1201 West Peachtree Street NW
                                       Suite 3900
                                       Atlanta, Georgia 30309
                                       Telephone: (404) 881-4100
                                       Facsimile: (404) 881-4111
                                       mixson@bmelaw.com
                                       seals@bmelaw.com

                                       *Local Counsel for Lead Plaintiff*
                                       *Union Asset Management Holding AG*

26

## **RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that this document has been prepared with 14 point Times New Roman, one of the font and point selections approved by the Court in Local Rule 5.1(C).

*/s/ James A. Harrod*
James A. Harrod

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing and make available the same to all attorneys of record.

*/s/ James A. Harrod*
James A. Harrod