**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **IN RE EQUIFAX INC. SECURITIES LITIGATION** | Consolidated Case No. 1:17-cv-03463-TWT |

**DECLARATION OF JAMES A. HARROD IN SUPPORT
OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AND PLAN OF
ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR
<u>ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................1

II.  PROSECUTION OF THE ACTION.............................................................11

    A.  Background ...............................................................................11

    B.  Commencement of the Action and Organization of the Case ...............12

    C.  Lead Plaintiff's Preparation and Filing of the Consolidated
       Class Action Complaint ..............................................................19

    D.  Defendants' Joint Motion to Dismiss the Consolidated
       Class Action Complaint ..............................................................21

    E.  Defendant Equifax's Motion for Clarification of the
       Court's January 28, 2019 Opinion and Order.................................27

    F.  Defendants' Joint Motion to Certify Questions Presented by
       the Court's January 28, 2019 Order for Interlocutory
       Review Pursuant to 28 U.S.C. § 1292(b).......................................29

    G.  Lead Plaintiff's Discovery Efforts................................................32

    H.  Lead Plaintiff's Motion for Class Certification ...............................36

    I.  Settlement Negotiations .............................................................38

III.  THE SETTLEMENT STIPULATION AND PRELIMINARY
     APPROVAL OF THE SETTLEMENT .......................................................40

IV.  RISKS OF CONTINUED LITIGATION ......................................................41

    A.  The Risks of Prosecuting Securities Actions.................................41

    B.  The Substantial Risks in Proving Defendants' Liability
       and Damages in This Case ..........................................................44

    C.  The Risks of Proving Falsity and Materiality.................................45

    D.  The Risks of Proving Scienter ....................................................49

    E.  The Risks of Establishing Loss Causation and Damages....................51

    F.  The Risks of Certifying the Class and Maintaining
       Class Certification.....................................................................57

    G.  The Risk of Appeal ...................................................................58

V.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION ...........59

VI.  LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE .............................................................................61

VII.  PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT...................................................................................64

VIII.  THE FEE AND EXPENSE APPLICATION .................................68

  A.  The Fee Application...............................................................69

    1.  Lead Plaintiff Has Authorized and Supports the Fee Application .............................................................70

    2.  The Time and Labor Devoted to  the Action by Plaintiff's Counsel ..................................................71

    3.  The Experience and Standing of Lead Counsel ............75

    4.  The Standing and Caliber of Defendants' Counsel........75

    5.  The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases .......76

    6.  The Reaction of the Settlement Class to the Fee Application.........78

  B.  The Litigation-Expense Application.....................................79

IX.  CONCLUSION.............................................................................84

JAMES A. HARROD declares as follows:

## I.    INTRODUCTION

1.    I, James A. Harrod, am a member of the bars of the State of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the U.S. Courts of Appeals for the Second, Third, and Seventh Circuits and am admitted *pro hac vice* in the above-captioned action (the "Action").  I am a Member of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"), the Court-appointed Lead Counsel in the Action.[1] BLB&G represents the Court-appointed Lead Plaintiff Union Asset Management AG ("Union" or "Lead Plaintiff").  I have personal knowledge of the matters stated in this Declaration based on my active supervision of and participation in the prosecution and settlement of the Action.

2.    I respectfully submit this Declaration in support of Lead Plaintiff's motion, under Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action (the "Settlement"), which the

---

[1] Unless otherwise defined in this Declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated February 13, 2020 (the "Stipulation" or "Settlement Stipulation"), and previously filed with the Court. *See* ECF No. 159.

Court preliminarily approved by its Order dated February 25, 2020 (the "Preliminary Approval Order"). ECF No. 163.

3.     I also respectfully submit this Declaration in support of: (i) Lead Plaintiff's motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for an award of attorneys' fees in the amount of 20% of the Settlement Fund, net of expenses; payment of Litigation Expenses incurred by Plaintiff's Counsel's in the amount of $659,925.13; and payment of $121,375.00 to Union in reimbursement of its costs and expenses directly related to its representation of the Settlement Class (the "Fee and Expense Application").[3]

4.     The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $149 million for the benefit of the

---

[2] Plaintiff's Counsel are: Lead Counsel BLB&G and Bondurant Mixson & Elmore LLP, local counsel for Lead Plaintiff and the Class.

[3] In conjunction with this Declaration, Lead Plaintiff and Lead Counsel are also submitting the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

Settlement Class. The proposed Settlement represents an excellent result for the Settlement Class, considering the significant risks in the Action and the amount of the potential recovery. The Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover nothing or substantially less than the Settlement Amount after years of additional litigation and delay.

5.    This beneficial Settlement was achieved as a direct result of Lead Plaintiff's and Lead Counsel's efforts to diligently investigate, vigorously prosecute, and aggressively negotiate a settlement of this Action against highly skilled opposing counsel.

6.    Notably, the maximum potential damages that could be realistically established at trial in this Action were approximately $588 million. The proposed Settlement of $149 million thus represents a recovery of approximately 25% of the likely recoverable damages for the Settlement Class (before an award of attorneys' fees and reimbursement of Litigation Expenses). This is an outstanding result for Class Members given the risks of the litigation. Indeed, this percentage recovery is particularly noteworthy in comparison to the finding that, from 2010-19, in all securities class actions with estimated damages in the range of $500-999 million,

the median settlements recovered only 3.7% of damages (before reductions for attorneys' fees and litigation expenses). *See* Cornerstone Research, *Securities Class Action Settlements 2019 Review and Analysis* (2020), attached as Exhibit 5, at 6.

7.    When viewed in this context, the percentage recovery achieved in this case is extremely favorable, even putting aside the substantial liability, loss-causation and damages risks in this case.  It is also significant in absolute dollars relative to other securities-class-action recoveries nationwide.   The inflation adjusted median securities-class-action settlement in the Eleventh Circuit between 2010 and 2019 was $6.3 million.  *Id.* at 20.  Similarly, the inflation adjusted median securities-class-action settlement nationwide between 1996 and 2019 was $8.9 million.  *Id.* at 19.  By comparison, the proposed $149 million Settlement provides an exceptional benefit for the Settlement Class and is the largest securities class action recovery in history related to a data breach.

8.    The benefit that the proposed Settlement will provide to the Settlement Class is also particularly meaningful when considered against the substantial risk that the Settlement Class might recover significantly less (or nothing) if the Action were litigated through additional dispositive motions, trial, and any appeals that would likely follow—a process that could last years.  As discussed in more detail below, if this case continued to be litigated, there is no

guarantee that Lead Plaintiff or the Settlement Class could establish Defendants' liability.  Defendants would put forth powerful arguments, among other things, that Defendants' statements were not materially false and misleading; that Lead Plaintiff could not prove the scienter of Defendants Equifax or Smith, or any other senior officer of the Company, and thus could not prove that Equifax acted with scienter; that the case should not be certified as a class action; and that Lead Plaintiff could not prove loss causation or damages.

9.    As also discussed in more detail below, the Settlement was achieved as a direct result of extensive efforts by Lead Counsel.  Those efforts included:

i.    Conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants during the period from February 25, 2016 through September 15, 2017, inclusive (the "Class Period"), including consulting with experts and reviewing the voluminous public record;

ii.    Drafting the 186-page Consolidated Class Action Complaint (the "Consolidated Complaint" or "Complaint"), filed with the Court on April 23, 2018 (ECF No. 49), which incorporated material from SEC filings, press releases and other public statements issued by Equifax, news articles, social media posts, and other publicly available sources of information concerning Equifax, research reports by securities analysts, transcripts of Equifax calls with investors, federal and state regulations and regulatory materials from the United States and abroad, industry best practices for cybersecurity, information from prior data breach incidents at Equifax, Congressional testimony and reports, and actions brought by

the Federal Trade Commission with respect to cybersecurity deficiencies;

iii.      Successfully moving to modify the discovery stay imposed by the PSLRA on April 27, 2018 (ECF No. 52) to engage in the same case management and discovery planning activities that were ongoing in the multidistrict litigation, *In re Equifax, Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800-TWT (N.D. Ga.);

iv.      Successfully opposing (in significant part) Defendants' joint motion to dismiss the Complaint, consisting of nearly 230 pages of briefing and exhibits, by researching and drafting a 72-page opposition brief responding to Defendants' arguments and a 28-page response to Defendants' false statement chart, which Lead Plaintiff filed with the Court on July 23, 2018 (ECF Nos. 69 and 69-1) and argued before the Court on December 11, 2018 for nearly two hours and thirty minutes (ECF No. 80);

v.      Successfully opposing Defendant Equifax's motion for clarification regarding the Court's corporate scienter findings in its January 28, 2019 Order regarding the Motion to Dismiss (ECF No. 88);

vi.      Preparing and filing a Motion for Class Certification on March 29, 2019 (ECF No. 102), including working with an expert to prepare a report on market efficiency and the availability of class-wide damages methodologies, defending the depositions of Lead Plaintiff's representatives and expert, deposing Defendants' expert, and preparing a reply in support of Class Certification filed on October 11, 2019 (ECF No. 147), which included a rebuttal expert a report;

vii.      Successfully opposing Defendants' joint motion to certify questions related to the Court's January 28, 2019 Order regarding the motion to dismiss for interlocutory review pursuant to 28 U.S.C. 1292(b), which the Court denied on July 29, 2019 (ECF No. 135);

viii.    Consulting with experts regarding loss-causation, damages, and cybersecurity issues presented by this Action;

ix.    Engaging in significant discovery, including producing over 28,150 pages of documents from Lead Plaintiff, drafting and serving extensive discovery requests on Defendants and document subpoenas upon several dozen relevant nonparties, responding to document requests served by Defendants, serving and responding to interrogatories and litigating discovery disputes, reviewing and analyzing more than 1.035 million pages of documents produced by Defendants and third parties, drafting a motion to compel (ECF No. 129), exchanging extensive correspondence regarding discovery with Defendants, and filing an emergency motion for a discovery conference on October 24, 2019 (ECF No. 152);

x.    Engaging in intensive, arm's-length negotiations with Defendants for approximately six months, including the submission of detailed mediation statements, attending an all-day mediation before the Hon. Layn R. Phillips (USDJ, Ret.) and months of follow-up negotiations through Judge Phillips, which ultimately culminated in the agreement to settle the Action for $149 million in cash; and

xi.    Drafting and negotiating the Settlement Stipulation and related settlement documentation.

10.    The close attention paid and oversight provided by the Lead Plaintiff, Union, throughout this case is another factor in favor of the reasonableness of the Settlement.  In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts

by improving the quality of representation in securities class actions.  H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733.  Here, Lead Plaintiff's representatives were actively involved in overseeing the litigation and settlement negotiations.  *See* Declaration of Jochen Riechwald submitted by Union (the "Riechwald Decl."), attached as Exhibit 1.

11.    Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their substantial efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a highly favorable outcome for the Settlement Class.

12.    In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Plaintiff's experienced expert for market efficiency, damages, and loss causation, Steven P. Feinstein, Ph.D., C.F.A., developed the Plan of Allocation in consultation with Lead Counsel.  The Plan provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Settlement Class Members who submit Claim Forms that are approved for payment by the Court.  Each Claimant's share will be calculated based on his, her, or its losses attributable to the alleged fraud, similar to what likely would have

been awarded at trial if the Action had not been settled and had continued to trial following motions for class certification and summary judgment, other pretrial motions, and resulted in a verdict favorable to the proposed class.

13.    Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis and incurred significant Litigation Expenses and thus bore all the risk of an unfavorable result.  For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees for Plaintiff's Counsel of 20% of the Settlement Fund, net of Court-approved Litigation Expenses.  The 20% fee requested is based on a retainer agreement entered into with Lead Plaintiff at the outset of the litigation, and as discussed in the Fee Memorandum, is lower than the 25% "benchmark" fee established for percentage fee awards in the Eleventh Circuit and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries on a percentage basis.  Moreover, the requested fee represents a multiplier of approximately 1.59 on Plaintiff's Counsel's total lodestar, which is on the lower end of the range of multipliers typically awarded in class actions with significant contingency risks

such as this one, and thus, the lodestar cross-check also supports the reasonableness of the fee.

14.    Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiff's Counsel in connection with the institution, prosecution, and settlement of the Action totaling $659,925.13, plus reimbursement of $121,375.00 to Union for its costs and expenses directly related to its representation of the Settlement Class, as authorized by the PSLRA.

15.    For all of the reasons discussed in this Declaration and in the accompanying memoranda and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e).  For similar reasons, and for the additional reasons discussed below, I respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

16.    As the Court is aware, this securities class action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of investors who purchased Equifax common stock during the Class Period.

17.    Defendant Equifax, Inc. ("Equifax" or the "Company"), through itself and its operating segments, is one of the three largest credit reporting agencies in the world, and participates both in the business-to-business sector and the direct-to-consumer sector by collecting and selling data on more than 820 million consumers and business globally. The Company operates through four primary segments: U.S. Information Solutions (USIS); International; Workforce Solutions; and Global Customer Solutions.

18.    This case involves alleged misrepresentations and omissions by Defendants about protecting the confidential personal information of the hundreds of millions of consumers it receives and stores the personal data of.  In particular, Lead Plaintiff alleges that Defendants violated the federal securities laws by failing to disclose that Equifax knew it had poor cybersecurity practices and that its cybersecurity did not comply with industry standards or applicable regulations.

Lead Plaintiff further alleges in the Action that Equifax ignored warnings and lessons from smaller previous data breaches and failed to fix the problems that led to the September 2017 announcement of one of the most severe data breaches in history. Lead Plaintiff also alleges that Defendants' misrepresentations and omissions artificially inflated the prices of Equifax's common shares, which declined when the truth was revealed to the market through a series of partial corrective disclosures beginning on September 8, 2017 and ending on September 15, 2017, the last day of the Class Period.

### B.    Commencement of the Action and Organization of the Case

19.    On September 7, 2017, after Equifax disclosed the Data Breach, the first of hundreds of class actions was filed in the Northern District of Georgia on behalf of  consumers that were allegedly harmed by the Data Breach, *McGonnigal v. Equifax, Inc.*, No. 1:17-cv-03422-TWT (N.D. Ga.).

20.    On September 8, 2017, the first securities action relating to the Data Breach was filed in the Northern District of Georgia, *Kuhns v. Equifax Inc., et al.,* Case No. 1:17-cv-03463-WSD.

21.    Thereafter, on September 11, 2017, the plaintiffs in the *McGonnigal* action filed a motion with the United States Judicial Panel on Multidistrict Litigation ("JPML") seeking to centralize all of the related actions arising from

the Data Breach in the Northern District of Georgia.  MDL No. 2800 Dkt. No. 1.
On October 25, 2017, the securities actions, including *Kuhns* and *Groover v. Equifax Inc., et al.*, Case No. 1:17-cv-04511-WSD, were identified as "Tag-Along actions" to the Consumer MDL.

22.    On November 13, 2017, Union Asset Management Holdings AG ("Union") moved for its appointment as lead plaintiff and for approval of its selection of BLB&G as lead counsel.  Union asserted that it was the "most adequate plaintiff" under the PSLRA on the grounds that it had the "largest financial interest" in the relief sought by the putative class.

23.    Two additional plaintiff groups filed motions on November 13, 2017 seeking the movants' appointment as lead plaintiff and approval of their selection of lead counsel.  The competing lead-plaintiff applications were filed by Robert Brock ("Brock") and Frankfurt-Trust Investment GmbH ("Frankfurt").

24.    On December 6, 2017, the JPML issued an order centralizing 97 related actions in the Northern District of Georgia and assigning them to Chief Judge Thrash.

25.    Thereafter, while lead plaintiff briefing was ongoing, on December 11, 2017, the *Kuhns* action was reassigned to Chief Judge Thrash and centralized with the Consumer MDL.  The *Groover* action remained before Judge Duffey.

13

26.    On December 27, 2017, Defendants filed with the Court a letter addressing the inclusion of the *Kuhns* securities class action in the Consumer MDL.  ECF No. 25.  Defendants' letter argued that the securities class action was distinct from the Consumer MDL and should be litigated separately.  Among other things, Defendants pointed out that while the *Kuhns* case was included in the JPML's transfer order, the *Groover* action was not, and remained before Judge Duffey, so the inclusion of the *Kuhns* action may have been inadvertent. Defendants argued that it would be inefficient in any event to try to coordinate the securities actions with the Consumer MDL, including because under the PSLRA, no discovery could proceed in the securities cases until the complaint survived Defendants' motion to dismiss.

27.    On December 28, 2017, Lead Plaintiff responded to Defendants' December 27, 2017 letter.  ECF No. 26.  Lead Plaintiff's letter responded to Defendants' position, and further argued that centralizing the securities actions with the Consumer MDL would promote efficiency and was consistent with the way similarly complex litigations had been treated.

28.    On January 4, 2018, Defendants filed a letter with both Chief Judge Thrash and Judge Duffey in response to Lead Plaintiff's December 28, 2017 letter. ECF No. 27.  Defendants' letter again expressed their position that the inclusion of

*Kuhns* in the Consumer MDL appeared to have been inadvertent, and that in any case, securities class actions should be kept separate from consumer MDLs.

29.    On January 9, 2018, the Court held a status conference.  MDL ECF No. 98.  During the status conference, the Court asked the parties to present their positions on the consolidation or centralization of the consumer MDL and the securities cases.  The Court, agreeing with Lead Plaintiff, decided that "one judge ought to be handling both the MDL case and the two securities cases.  One of the securities cases has already been transferred to me, and I'm going to talk to Judge Duffey about the other one.  . . . I anticipate that Judge Duffey's case will probably be transferred to me.  And my intention is that the MDL proceeding and the securities cases will be coordinated."  The Court clarified that the soon-to-be consolidated securities cases would not be consolidated with the consumer MDL but would be coordinated with the MDL in terms of discovery, procedure, and status conferences.

30.    On February 21, 2018, the Court issued an Order Appointing Lead Plaintiff, Approving Selection of Lead Counsel, and Addressing Case Management in this Action.  ECF No. 32.  Among other things, that order instructed the parties to "present to the Court a proposed discovery plan" and to meet and confer regarding further case management orders concerning initial

disclosures, requests for the production of documents, document preservation, and a discovery protocol.

31.    On March 5, 2018, the parties held a meet and confer pursuant to the Court's February 21, 2018 order.  It was Lead Plaintiff's position that the parties were required to discuss the various case management topics outlined in the order, including those related to discovery.  It was Defendants' position that their obligation to confer on discovery matters was suspended pending adjudication of Defendants' motion to dismiss, and that discussion of such matters was barred by the PSLRA discovery stay, 15 USC 78u-4(b)(3)(B).

32.    On March 23, 2018, the parties each submitted a report addressing case management in response to the Court's February 21, 2018 order expressing their diverging positions.  ECF Nos. 39, 40.

33.    On April 3, 2018, the Court held a status conference during which the parties' presented their opposing views on the coordination of discovery and what discovery activities should be permitted prior to the Court's ruling on Defendants' eventual motion to dismiss.  ECF No. 46.  Following that status conference, the Court ordered that Lead Plaintiff file a motion regarding the need for a modification of the PSLRA discovery stay and seeking permission to serve document preservation subpoenas on third parties.

34.    On April 27, 2018, four days after filing the Complaint (discussed below), Lead Plaintiff filed a Motion for Limited Modification of the PSLRA Discovery Stay (the "PSLRA Modification Motion").  ECF No. 52.  The PSLRA Modification Motion sought an order requiring Defendants to meet and confer regarding a protective order and ESI protocol, as well as a proposed discovery schedule and case management order; allowing the parties to serve initial requests for the production of documents and responses and objections to such requests; requiring the parties to meet and confer concerning custodians; and allowing the parties to serve document preservation subpoenas on third parties.  Lead Plaintiff argued that engaging in early discovery planning activities would have benefits from a judicial efficiency and case management perspective, particularly in light of the procedural posture of the MDL cases.  Lead Plaintiff argued that the discovery stay under the PSLRA is not absolute, and that the Court has discretion to grant the stay where necessary to prevent undue prejudice and maintain case management in complex litigation.  Lead Plaintiff also argued that the concerns motivating the PSLRA discovery stay were not implicated by the present circumstances.

35.    On May 11, 2018, Defendants filed a Response in Opposition to Lead Plaintiff's PSLRA Modification Motion.  ECF No. 53.  Defendants argued among

other things that Lead Plaintiff did not establish the exceptional circumstances necessary to modify the PSLRA stay, and that Lead Plaintiff would suffer no undue prejudice. Defendants argued further that Lead Plaintiff sought to undermine the purpose of the discovery stay and that Defendants would endure unnecessary burden and expense should the PSLRA Modification Motion be granted.

36.    On May 18, 2018, Lead Plaintiff filed a reply to Defendants' Opposition in which it reiterated the points made in its PSLRA Modification Motion and responded to Defendants' arguments. ECF No. 55.

37.    Thereafter, on May 22, 2018, the Court held a status conference during which it heard argument from both parties on Lead Plaintiff's PSLRA Modification Motion. ECF Nos. 57 and 58.

38.    On June 18, 2018, the Court granted in part Lead Plaintiff's PSLRA Modification Motion, noting that Lead Plaintiff "is only seeking permission to begin the same discovery preparations that are already underway in the MDL proceedings. This request is especially reasonable when taking the context of the entire case into account—this is a large, complicated case coinciding with several other complex cases arising out of the data breach." ECF No. 64.

**C.    Lead Plaintiff's Preparation and Filing of the Consolidated Class Action Complaint**

39.    To prepare the Complaint, Lead Counsel conducted an extensive factual and legal investigation.  The investigation included, among other things, a review and analysis of (i) documents filed publicly by Equifax with government regulators (including the United States Securities Exchange Commission); (ii) press releases, websites, and other public statements issued by Equifax and its operating segments; (iii) transcripts of Equifax investor conference calls; (iv) advertisements and marketing materials published by Equifax; (v) research reports concerning Equifax by financial and securities analysts; (vi) information from government and regulatory investigations into Equifax and its operating segments; (vii) news reports and other publicly available sources of information concerning Equifax; (viii) interviews with former employees; (ix) information concerning cybersecurity generally, including applicable regulations and industry practices or standards; (x) information concerning data breaches and regulatory actions taken regarding data security lapses; (xi) information concerning Equifax's history of data breaches and data security; and (xii) information concerning the Data Breach and Equifax's response to it.

40.    Lead Counsel also consulted with experts to assist in their analysis of the case and preparation of the Complaint.  The experts retained by Lead Counsel

included (i) market-efficiency and damages experts, who advised Lead Plaintiff on damages and prepared a draft market-efficiency report for Lead Plaintiff's motion for class certification, and (ii) cybersecurity experts who provided consulting services regarding Equifax's statements regarding cybersecurity and the Data Breach and Lead Plaintiff's allegations regarding the same.

41.    Following Lead Counsel's extensive investigation and consultation with experts, on April 23, 2018, Union filed the Consolidated Class Action Complaint.  ECF No. 49.  The Complaint asserted claims under § 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 against Defendants Equifax, former Equifax Chief Executive Officer and Chairman of the Board of Directors Richard F. Smith ("Smith"), Equifax Corporate Vice President and Chief Financial Officer John W. Gamble ("Gamble"), President of Equifax's Workforce Solutions segment Rodolfo O. Ploder ("Ploder"), and former Equifax Senior Vice President of Investors Relations Jeffrey L. Dodge ("Dodge" and together with Smith, Gamble and Ploder, the "Individual Defendants"), as well as claims under § 20(a) of the Individual Defendants.  The claims were based on allegations that Defendants fraudulently misrepresented and concealed material facts regarding Equifax's commitment to cybersecurity and the Company's compliance with data security standards, practices, and regulations.  In particular,

the Complaint alleged that Defendants violated the federal securities laws by failing to disclose that Defendants knew that the Company had poor cybersecurity practices yet falsely touted the strength of the Company's cybersecurity, an integral facet of its business which revolves around collecting and storing sensitive personal information of hundreds of millions of consumers. The Complaint further alleged that Defendants falsely assured investors that Equifax complied with data protection laws, regulators and industry best practices and also falsely certified the integrity of its internal controls. The Complaint alleged that these false and misleading statements were made with scienter, and caused Equifax common stock to be inflated, damaging Union and the other investors making up the class.

### D. Defendants' Joint Motion to Dismiss the Consolidated Class Action Complaint

42.    On June 7, 2018, Defendants filed their joint motion to dismiss the Complaint. ECF No. 62. Defendants argued that the Complaint should be dismissed on numerous grounds, including, among others, the following:

>    (i)    The 10(b) claims asserted by Lead Plaintiff in the Complaint failed to plead particularized facts as to why the challenged statements were false and misleading;

>    (ii)    Lead Plaintiff failed to plead particularized facts giving rise to a "strong inference" that Defendants acted with the "required state of mind," i.e. scienter;

(iii)   Lead Plaintiff failed to adequately plead that its losses were caused by the alleged "fraud" set forth in the Complaint; and

(iv)   The 20(a) claims asserted by Plaintiff in the Complaint failed to plead a primary violation under Section 10(b) against Defendants Smith, Gamble, Dodge, and Ploder and further failed to adequately plead Defendants Smith's, Gamble's, Dodge's, and Ploder's control over the specific corporate policy that resulted in any alleged primary violation.

43.   Specifically, as to whether their statements were false and misleading, Defendants argued that Lead Plaintiff's allegations that Defendants' security measures were inadequate were insufficient, amounting to inactionable claims of corporate mismanagement under Section 10(b). *See, e.g., Santa Fe Indus. v. Green*, 430 U.S. 462, 479-80 (1977) (allegations of mismanagement or the failure to disclose the same are insufficient to plead a Section 10(b) violation); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242-44 (M.D. Fla. 2002) (applying *Santa Fe*). Defendants argued that similar claims to those in this Action were dismissed in a case stemming from a cyber-attack involving theft of 130 million credit and debit card numbers. *See In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *5 (D.N.J. Dec. 7, 2009) (finding that breach did not render defendants' aspirational statements about security false or misleading). Further, Defendants argued that their failure to disclose the breach prior to September 7, 2017 did not constitute a violation of Section 10(b). Additionally, Defendants

argued that alleged statements about their commitment to security were generalized, non-verifiable, and vague statements, or "puffery." Defendants also argued that several of the alleged false statements were inactionable because they were forward-looking and protected by the relevant provisions of the PSLRA. Finally, Defendants argued that Lead Plaintiff's alleged false statements included many "opinion" statements and that Lead Plaintiff failed to plead that the Defendants did not believe the stated opinion or beliefs expressed.

44.    As to scienter, Defendants argued in their motion to dismiss that Lead Plaintiff failed to show that Equifax and the Individual Defendants acted with wrongful intent, such as an intent to deceive, and that Union failed to plead facts that gave rise to an inference of scienter that was "cogent," "strong," and "at least compelling as any opposing [non-fraudulent] inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Specifically, Defendants argued that allegations reflecting certain warnings about Equifax's cybersecurity vulnerabilities—including problems with "patching"—were inadequate to create an inference that such warnings were ever actually communicated to any of the Individual Defendants, including alleged findings of cybersecurity consultant Mandiant LLC ("Mandiant"), which were reported in the news media. Defendants also argued that Equifax's experiences

from alleged prior data security incidents did not amount to information that was symptomatic of fundamental institutional data security failures because none of those previous incidents were comparable to the breach disclosed on September 7, 2017. Finally, Defendants argued that Lead Plaintiff's reliance on statements and events post-dating the breach amounted to fraud-by-hindsight and were insufficient to sustain a claim of securities fraud pursuant to Section 10(b).

45.    Finally, Defendants argued that Lead Plaintiff failed to adequately plead loss causation because none of the alleged corrective disclosures revealed that any of Defendants' prior statements were false when made. Defendants also argued that certain executive resignations from Equifax following the announcement of the Data Breach did not reveal a "then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint."

46.    Defendants' motion-to-dismiss submissions (including Defendants' reply briefs, discussed below) comprised approximately 230 pages of briefing and exhibits.

47.    On July 23, 2018, Lead Plaintiff filed its opposition to Defendants' joint motion to dismiss the Consolidated Class Action Complaint. ECF No. 69 ("MTD Opp."). Lead Plaintiff responded to Defendants' arguments and argued

that the Complaint adequately alleged materially misleading statements, scienter, and loss causation.

48.    Specifically, Lead Plaintiff argued that Defendants knew that adequately securing the data in its custody was of paramount importance to investors and they therefore made number statements about the strength of the Company's cybersecurity and that Defendants' reliance upon *Santa Fe* was misplaced because that case stands for the "unremarkable proposition that a defendant's breach of fiduciary duty does not state a Section 10(b)."  MTD Opp. at 16, n. 4.  Lead Plaintiff argued that this Action was more akin to *In re ChoicePoint, Inc. Sec. Litig.*, where securities fraud claims were sustained over a motion to dismiss in a case involving a data company's statements touting its cybersecurity.  *See* 2006 WL 8429145, at *6 (N.D. Ga. Nov. 21, 2006).  Lead Plaintiff also argued that Defendants' more technical arguments—that the alleged false statements were puffery, forward-looking, or opinions—should be rejected, citing extensive authorities finding that arguably similar statements were actionable.

49.    Regarding scienter, Lead Plaintiff argued that the Complaint includes a litany of facts that, when considered collectively, easily pled scienter.  Lead Plaintiff argued that among the facts it pled included: (i) warnings in the form of

prior breaches, audits, and reports (including the results of the early 2017 Mandiant report, which were alleged to have been provided to Defendant Smith beginning in March of 2017); (ii) the "critical" nature of cybersecurity to Equifax's business; (iii) Defendants' own statements about their focus on data security; (iv) the magnitude and pervasiveness of Equifax's cybersecurity deficiencies; (v) Defendants' admissions that they knew about the Data Breach by at least July 2017; (vi) the firing of key executives; and (vii) suspicious insider sales.

50.    Finally, as to loss causation, Lead Plaintiff argued that disclosure of the data breach and subsequent news *did* "correct" the prior false statements alleged in the Complaint, including by revealing the existence and magnitude of Equifax's alleged cybersecurity deficiencies.  Union also argued that issues of loss causation are fact-intensive and subject only to notice pleading.

51.    On August 22, 2018, Defendants filed their reply brief in further support of their motions to dismiss.  ECF No. 72.  Defendants reiterated the arguments made in their opening brief and replied to the arguments made in Lead Plaintiff's Opposition.  In particular, Defendants argued that Plaintiff's securities fraud claims were "based on little more than hindsight criticism of Equifax" following the Data Breach and that allegations that Equifax failed to prevent the

attack were not adequate to plead that Defendants' statements were misleading or sufficient to raise a strong inference of scienter.  ECF No. 72 at 6.

52.    On December 11, 2018, the Court heard over two hours of oral argument on Defendants' motions to dismiss the Complaint.

53.    On January 28, 2019, the Court entered its 109-page Opinion and Order (the "Opinion") granting in part and denying in part Defendants' motions to dismiss the Complaint.  ECF No. 84.  The Court dismissed, with prejudice, all claims against Defendants Gamble, Ploder, and Dodge.  The Court also dismissed certain of Plaintiff's alleged false statements, including those concerning Equifax's internal and disclosure controls.  In all other respects, the Court denied Defendants' motions to dismiss.

### E.    Defendant Equifax's Motion for Clarification of the Court's January 28, 2019 Opinion and Order

54.    On February 19, 2019, Defendant Equifax filed a motion for clarification concerning parts of the Court's Opinion related to corporate scienter. ECF No. 88.  Specifically, Equifax argued that the Opinion was unclear as to the basis for the Court's finding that the Complaint adequately alleged Equifax's corporate scienter.  Equifax argued that while the Opinion clearly found scienter as to Smith attributable to the Company, "[w]hat is not clear is whether the Order also finds that the scienter of any *other* Equifax officials is adequately alleged and

27

is attributable to Equifax, and if so, who those officials are." *Id.* at 3 (emphasis in original). The Opinion found that the Complaint alleged that corporate officials were warned about the data security issues at Equifax, and that such warnings were sufficient to establish that those officials knew of the data security problems and would have had a role in crafting the allegedly false and misleading statements identified in the Complaint. Defendants argued, however, that the Opinion did not make clear which specific individuals responsible for the challenged statements allegedly possessed this information and what roles those individuals had with respect to the challenged statements, and thus created an ambiguity as to whether it was Defendant Smith's scienter alone that was being imputed to Equifax. Equifax sought clarification of this issue.

55.    On March 5, 2019, Lead Plaintiff filed a response in opposition to Equifax's Motion for Clarification. ECF No. 95. Lead Plaintiff argued in its opposition brief that clarification was unnecessary and that Defendants' motion was, in effect, a motion for reconsideration, and that Equifax failed to meet the stringent standard for reconsideration. Lead Plaintiff also argued that because the Court rightly found that Defendant Smith had scienter and his scienter is imputed to Equifax, Defendants' request for clarification would not alter the scope of the litigation. Lead Plaintiff further put forth that Equifax misstated Eleventh Circuit

law on what corporate scienter requires, and argued that the Complaint's allegations raised a strong inference of scienter under that standard.

56.    On March 19, 2019, Defendants filed a reply in support of their Motion for Clarification.  ECF No. 97.  Defendants reiterated the arguments made in their opening brief and further argued that the Complaint's allegations were insufficient to establish corporate scienter under the Eleventh Circuit standard.[4]

57.    During a status conference held on April 3, 2019, the Court heard argument concerning Equifax's Motion for Clarification and subsequently denied it.  ECF No. 103.

**F.    Defendants' Joint Motion to Certify Questions Presented by the Court's January 28, 2019 Order for Interlocutory Review Pursuant to 28 U.S.C. § 1292(b)**

58.    On April 10, 2019, Defendants filed a joint motion to certify questions presented by the Court's January 28, 2019 Opinion for interlocutory review pursuant to 28 U.S.C. § 1292(b) (the "1292(b) Motion").  ECF No. 105.  In their 1292(b) Motion, Defendants presented three questions: first, "[w]hether generic statements regarding commitment to cybersecurity and devotion of 'significant' or 'substantial' resources to compliance can be materially misleading

and actionable under Section 10(b) of the Exchange Act"; second, whether "allegations based on statements attributed to anonymous sources in news articles must include particular facts describing the foundation or basis of the sources' knowledge of the matters asserted to raise a strong inference that a defendant acted with scienter"; and third, "[w]hether statements made by a corporate official at a breakfast talk to a limited audience not alleged to have included analysts or investors can qualify as statements made 'in connection with' the purchase or sale of a security under Section 10(b)." Defendants argued that certification of an order for immediate interlocutory review of the preceding questions was appropriate because they involved controlling questions of law, an appeal of which may materially advance the ultimate termination of the litigation.

59.    On April 24, 2020, Lead Plaintiff filed its opposition to Defendants' 1292(b) Motion. ECF No. 111. Lead Plaintiff argued that the strict standards governing a 1292(b) motion were not met because there were not "exceptional circumstances" in this Action. Next, Lead Plaintiff argued, in response to Defendants' contention that certain false statements were "immaterial," that the Court applied well-settled materiality principles and interlocutory review of that

---

[4] During briefing on Defendant Equifax's Motion for Clarification, Lead Plaintiff

application to a fraction of the statements at issue in the Action was unwarranted. Further, Lead Plaintiff argued that the Court correctly articulated and applied Eleventh Circuit precedent with respect to the necessary amount of detail for "anonymous" source scienter allegations to be credited, negating any need for further review. Finally, Lead Plaintiff argued that an appeal of the Court's holding that a single statement broadcast over the internet was made "in connection with the purchase or sale of securities" was inappropriate and unwarranted.

60. On May 8, 2019, Defendants filed a reply in further support of their 1292(b) Motion. ECF No. 116. Defendants reiterated the arguments made in their opening brief and replied to the arguments made in Lead Plaintiff's Opposition. Defendants argued that they sought certification of "three purely legal questions concerning the standards that must be met to plead viable securities fraud claims" and that the "Eleventh Circuit Court of Appeals can decide these questions without having to delve beyond the surface of the record." ECF 116 at 2 (citing *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004).

61. On July 29, 2019, the Court entered an order denying Defendants' 1292(b) Motion. ECF No. 135.

---

prepared and filed its Motion for Class Certification.

### G.    Lead Plaintiff's Discovery Efforts

62.    Following the Court's Order modifying the PSLRA stay, the Parties engaged in extensive discussions regarding the substance and process for discovery.  These efforts resulted in, among other things, the Parties' Stipulated Discovery Schedule and Case Management Order, which the Court had entered on July 20, 2018 (ECF No. 68).  That same day, the Court approved the Parties' Stipulated Protective Order (ECF No. 67).

63.    In addition, on August 8, 2018, Lead Plaintiff served its first set of requests for production of documents ("RFPs") on Defendants.  On August 22, 2018, following the Parties' negotiations, they filed Stipulation and Order for the Production of Documents and ESI, which the Court approved on August 23, 2018. ECF No. 73.  Following service of Lead Plaintiff's RFPs, the Parties conferred extensively with respect to search terms for documents responsive to those RFPs.

64.    On March 28, 2019, following the Court's resolution of the Defendants' motions to dismiss the Complaint, the Defendants filed their Answers.  ECF Nos. 100 and 101.

65.    On April 15, 2019, the Parties formally initiated discovery with the filing of a Joint Proposed Discovery Plan pursuant to Fed. R. Civ. P. 26(f) (ECF No. 108).

66.    Between April 2019 and November 2019, the Parties exchanged initial disclosures under Fed. R. Civ. P. 26(a)(1), served and responded to interrogatories, served and responded to document requests, served and responded to requests for admission, and engaged in protracted negotiations, including both extensive written correspondence and numerous meet-and-confers, concerning search terms and custodians for their respective document searches and productions.

67.    During discovery, the parties negotiated production of documents from the files of approximately 50 Equifax custodians, and, in total, Defendants produced over 1 million pages of documents to Lead Plaintiff.  Furthermore, Lead Plaintiff served document subpoenas on and subsequently met and conferred with eighteen third parties.  These third parties produced over 31,400 pages of documents.  In addition, Lead Plaintiff produced over 28,150 pages of documents to Defendants.

68.    Plaintiff's Counsel deployed a team of approximately 25 attorneys, who spent about seven months reviewing, coding and analyzing the documents produced by Defendants and third parties, prioritizing them by custodian and through the use of targeted search terms.  They researched issues related to the factual issues in the discovery materials, identified witnesses to be deposed,

examined questions of privilege, and identified potential deficiencies or gaps in the documents produced. The discovery team also produced numerous memos outlining the results of their research into the factual, discovery and privilege issues that came up. Throughout the discovery period Plaintiff's Counsel had weekly "all-hands" meetings to review and discuss critical documents, address issues of concern and plan the next steps in the review process, including preparing for depositions. At the time the Settlement was reached, Lead Plaintiff's review of the documents was ongoing and Plaintiff's Counsel were in the midst of producing several "witness kits" in connection with the scheduled or anticipated depositions to occur over the next few months.

69.    At the time the Settlement was reached, Lead Counsel was negotiating with Defendants' Counsel regarding the taking of depositions in coordination with counsel for plaintiffs in the then-ongoing MDL actions, pursuant to the Coordinated Discovery Order entered by the Court on September 4, 2019 (ECF No. 144) (the "CDO"). The CDO added another layer of complexity to the case, requiring extensive negotiation and coordination to set the schedule for two dozen depositions over the course of a three-month span. Those depositions were set to begin on November 18, 2019 and when the settlement in

principle was reached on November 8, 2019, the parties had either scheduled or were negotiating the scheduling of 15 additional depositions.

70.    During discovery numerous disputes arose concerning the scope, adequacy and timing of Defendants' and third-party document productions, most of which were resolved by agreement of the parties.  Other disputes, including those concerning the protracted negotiation of custodians and search terms for the documents responsive to Lead Plaintiff's RFPs and Defendants' assertion of privilege over documents from Mandiant, a third party consultant who provided cybersecurity services to Equifax, were raised with the Court during status conferences held on February 19, 2019 and June 12, 2019.  In addition, several disputes were formally presented to the Court for resolution, including the following:

> (a)    Plaintiff's motion to compel documents from Mandiant, as well as a deposition of a Mandiant representatives pursuant to Fed. R. Civ. P. 30(b)(6), challenging Equifax's assertion that the information requested was privileged or attorney work-product (ECF No. 129); and

> (b)    Plaintiff's motion for a discovery conference with respect to deficiencies in Equifax's document productions, privilege logs,

and interactions with third parties in receipt of document subpoenas, which remained pending before the Court at the time the Parties agreed in principle on a settlement (ECF No. 152).

### H.   Lead Plaintiff's Motion for Class Certification

71.   Lead Plaintiff's motion for class certification (the "Class Certification Motion") was filed on March 29, 2019 (ECF No. 102).   Union's Class Certification Motion argued that the proposed class met every requirement of Rules of 23(a) and 23(b)(3).   The motion was supported by Dr. Steven P. Feinstein's Report on Market Efficiency ("Feinstein Report"), which included the opinions of Lead Plaintiff's expert on the subjects of market efficiency and the availability of accepted methods for determining class-wide damages.   As noted above, in connection with its Class Certification Motion, Union produced over 28,150 pages of documents from 21 custodians, in response to Defendants' requests.   Defendants also deposed, and Lead Counsel defended, two representatives of Union (Dr. Carsten Fischer and Jochen Riechwald) and Dr. Feinstein.

72.   The Defendants filed their opposition to class certification on August 12, 2019 (ECF No. 140) (the "Opposition").   Defendants' Opposition was

supported by the Rebuttal Report of René Stulz ("Stulz Report"). In the Opposition, Defendants asserted that Lead Plaintiff had failed to carry its burden to establish the existence of an acceptable model for determining class-wide damages, which failure precluded class certification. Defendants also argued that class certification should be denied because Lead Plaintiff's damages claims relied on a "materialization of the risk" theory of loss causation that was inconsistent with a finding of predominance under Rule 23(b)(3). Lead Counsel deposed Dr. Stulz concerning the opinion in his report on September 24, 2019 in Atlanta.

73.    Lead Plaintiff filed its reply in support of the Class Certification Motion on October 11, 2019 (ECF No. 147). The reply was accompanied by the Rebuttal Report of Professor Steven P. Feinstein ("Feinstein Reply Report"). In the reply, Lead Plaintiff articulated why its Class Certification Motion satisfied the requirements for predominance, including the adequacy of both the available damages model and its theory of loss causation. In addition, Lead Plaintiff cited numerous cases in which arguments similar to those raised by Defendants in this Action had been rejected by other Courts.

74.    The Class Certification Motion was pending when the parties reached an agreement in principle to settle the case for $149 million in November 2019.[5]

## I.    Settlement Negotiations

75.    The Parties began to explore a potential settlement of the Action in the spring of 2019 through discussions between counsel and ultimately through a mediation process overseen by the Hon. Layn R. Phillips (USDJ, Ret.).   The parties agreed to conduct an in-person mediation with Judge Phillips in June 2019 at his office in California.   In preparation for the mediation session, Lead Counsel prepared an opening brief and a subsequent submission responding to arguments in Defendants' opening brief.

76.    The June 2019 mediation lasted an entire day, with both sides engaging both with Judge Phillips and, at times, directly with each other regarding questions of liability and damages.   The parties had substantial disagreements, largely focused on loss causation, damages, and Union's ability to establish scienter at trial.   However, that mediation session ended without an agreement to resolve the Action.

---

[5] On January 17, 2020, the Court denied the motion for class certification without prejudice.   ECF No. 157.   In the Court's order, it wrote that the class certification motion "may be renewed if the case is not settled."

77.    Following the mediation, the Parties continued to engage in extensive discovery and other litigation efforts while the settlement process continued in parallel.

78.    In the settlement discussions, Lead Plaintiff provided Defendants with information concerning Class-wide damages and other merits-based considerations related to settlement.   In response, Defendants provided Lead Plaintiff with competing information concerning both damages and the merits of the case.   Lead Plaintiff and Lead Counsel carefully analyzed the information provided by Defendants, considered arguments and risks associated with their positions, consulted with their economic-damages expert concerning Defendants' positions, and provided detailed written responses on those points.

79.    The exchanges between the parties ultimately facilitated a series of intense, arm's-length negotiations in October and November 2019, facilitated by Judge Phillips.   Through those negotiations, in November 2019 the Parties accepted Judge Phillips's proposal to resolve the Action for $149 million. Accordingly, in November 2019, the Parties reached an agreement in principle to settle and release all claims against Defendants in the Action in return for a cash payment of $149 million to be paid by Equifax on behalf of all Defendants for the

benefit of the Settlement Class, subject to the execution of a formal stipulation and agreement of settlement and related papers.

## III. THE SETTLEMENT STIPULATION AND PRELIMINARY APPROVAL OF THE SETTLEMENT

80.     Following the agreement in principle, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.  On February 12, 2020, the Parties executed the Stipulation, which embodies the final and binding agreement to settle the Action. On February 13, 2020, Lead Plaintiff submitted the Parties' Stipulation to the Court as part of Lead Plaintiff's motion for preliminary approval of the Settlement (the "Preliminary Approval Motion").  ECF No. 159.

81.     On February 25, 2020, the Court entered the Preliminary Approval Order, which preliminarily approved the Settlement, conditionally certified the Settlement Class for settlement purposes, appointed Lead Plaintiff as class representatives, appointed Lead Counsel as class counsel, approved the proposed procedure to provide notice of the Settlement to potential Settlement Class Members, and set June 26, 2020 as the date for the final-approval hearing.  ECF No. 163.  On or about March 17, 2020, the $149 million Settlement Amount was deposited into an escrow account and has been earning interest for the benefit of the Settlement Class.

## IV.   RISKS OF CONTINUED LITIGATION

82.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $149 million cash payment.  The recovery represents a significant portion of the recoverable damages in the Action as determined by Lead Plaintiff's damages expert, particularly after considering certain of Defendants' arguments concerning loss causation and scienter.  As explained below, Defendants had substantial defenses with respect to liability, loss causation, and damages in this case.  These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiff and the Settlement Class would achieve no recovery at all, or a far smaller recovery than the Settlement Amount.

### A.   The Risks of Prosecuting Securities Actions

83.   In recent years, securities class actions have become riskier and more difficult to prove, given changes in the law, including numerous United States Supreme Court decisions.  For example, data from Cornerstone Research show that, in each year between 2010 and 2017, approximately half of all securities class actions filed were dismissed, and the percentage of dismissals was as high as 57% in 2013.  *See* Cornerstone Research, *Securities Class Action Filings 2019 Year In Review* (2020), attached as Exhibit 6, at 16.

84.    Multiple securities class actions have recently been dismissed at the summary-judgment stage.  *See, e.g., Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), aff'd sub nom. *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), aff'd, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1211 (S.D. Cal. 2010).  And even cases that have survived summary judgment have been dismissed before trial on Daubert motions.  *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), aff'd, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment sua sponte in favor of defendants after finding that plaintiff's expert was unreliable).

85.    Even when securities-class-action plaintiffs are successful at summary judgment, and overcoming Daubert motions and have gone to trial, there are still real risks that there will be no recovery or substantially less recovery for class members than in a settlement.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs favor on liability in

2010.  *See* 2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011).  In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of defendants on all claims.  *See id.* at *38.  In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation.  *See Hubbard v. BankAtlantic Bancorp, Inc*., 688 F.3d 713, 725 (11th Cir. 2012).

86.    There is also an increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended. The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l. Austl. Bank, Ltd.*, 561 U.S. 247.  As a result, many cases have been lost after thousands of hours had been invested in briefing and discovery.  For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs finding that Vivendi acted recklessly with respect to 57 statements, the

district court granted judgment for defendants following the change in the law announced in *Morrison. See* 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).

87.    In sum, securities class actions face serious risks of dismissal and nonrecovery at all stages of the litigation.

### B.    The Substantial Risks in Proving Defendants' Liability and Damages in This Case

88.    Even though Plaintiff prevailed at the motion-to-dismiss stage on several of their claims against Defendants, they continued to face substantial risks that the Court would find that they failed to establish liability, loss causation, or damages as a matter of law at summary judgment; if the Court were to permit the claims to proceed to trial, that a jury (or appeals court) would find against Lead Plaintiff; and even if Lead Plaintiff prevailed at trial, that the verdict would be overturned by an appellate court or reduced through other post-trial proceedings. Even the claims that were sustained have subsequently been subjected to a motion for clarification and a petition for interlocutory review pursuant to 28 U.S.C. § 1292(b) and significant arguments and risks, including that data breach was the materialization of a known risk.  As Defendants noted, in *In re Miller Indus., Inc. Securities Litigation,* this Court denied the motion to dismiss and then entered summary judgment in favor of the defendants on scienter, falsity, and materiality grounds, all of which are at issue in this litigation.  *See* 120 F. Supp. 2d 1371

(N.D. Ga. 2000). Thus, while Lead Plaintiff and Lead Counsel believe they advanced strong claims on the merits, Defendants vigorously contested liability with respect to nearly every element of Lead Plaintiff's claims.

### C.    The Risks of Proving Falsity and Materiality

89.    As detailed above, the core allegations in this case were that Defendants violated the federal securities laws by making materially false and misleading statements and failing to disclose material facts about Equifax's data security, including the Company's compliance with applicable industry standards and regulations. Defendants raised compelling arguments in their motion to dismiss, motion for clarification, and petition for interlocutory review, which would have formed the basis for similar arguments to be adduced at summary judgment and trial. Indeed, the challenge of proving that Defendants' alleged misrepresentations were both materially false and made with scienter are illustrated by the Court's granting the motion to dismiss with respect to three of the Individual Defendants.

90.    As noted above, Defendants would have continued to argue, as they did in their motion to dismiss the Complaint, that their alleged misstatements about Equifax's *commitment* to cybersecurity were immaterial "puffery"—

statements that are as a matter of law inactionable. This was the focus of Defendants' 1292(b) Motion.

91.    For example, the Complaint alleges that, during the Class Period, Equifax made the following statements about its *commitment* to cybersecurity, in public statements and filings:

(a)    Equifax: "As a trusted steward of consumer and business information, Equifax employs strong data security and confidentiality standards on the data we provide and on the access to that data. We maintain a highly sophisticated data information network that includes advanced security, protections and redundancies." (Complaint ¶ 53) (emphasis added);

(b)    Equifax: "We have built our reputation on our commitment to deliver reliable information to our customers (both businesses and consumers) and to protect the privacy and confidentiality of personal information about consumers. We also protect the sensitive information we have about the businesses. Safeguarding the privacy and security of information, both

online and offline, is a top priority for Equifax."  (Complaint ¶

54) (emphasis added); and

(c)     Smith: "[The Company] never take[s] for granted our need to

continue to innovate around data security.  I think we are in a

very good position now . . . [I] feel like we're in really good

shape."  (Complaint ¶ 55) (emphasis added).

92.    At least one court has found statements concerning data security

allegedly revealed to be false by a data breach to be insufficient.  *See In re

Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *5 (D.N.J. Dec. 7,

2009).  Defendants would continue to argue that these statements are "puffery"—

vague, generalized statements of corporate optimism upon which no reasonable

investor would rely.  For these reasons, there was a significant risk that, had the

litigation continued to trial, a jury could have found that these statements about

Equifax's cybersecurity did not trigger liability under the securities laws.

93.    With respect to the "commitment to cybersecurity" statements,

Defendants would have also asserted that the truth of such statements was

reflected in the work and investment Equifax actually made to maintain and

improve its data security program.  Similarly, Defendants would have argued that

the fact that the Company's data security defenses were overcome by

47

sophisticated cybercriminals does not establish that the Company's statements about cybersecurity were false or misleading. These arguments could undermine Plaintiff's theory of falsity, and, as discussed further below, scienter.

94.    Defendants would have also continued to argue, as they did in their motion to dismiss, that these statements were immaterial as a matter of law because they were merely allegations of corporate mismanagement, which the Supreme Court has held does not come within the ambit of conduct Congress sought to regulate under Section 10(b). Indeed, courts in the Eleventh Circuit, as well as across the country, have often found allegations of mere possible mismanagement and operations problems do not state a Section 10(b) claim. *See, e.g., Santa Fe Indus. v. Green*, 430 U.S. 462, 479–80 (1977); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989); *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1347 (M.D. Fla. 2007); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242-44 (M.D. Fla. 2002); *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998).

95.    Additionally, there was a significant risk that Lead Plaintiff would be unable to prove its allegation that Defendants made misleading and materially false statements regarding Equifax's data security standards and practices and failure to disclose purported internal mismanagement of these standards and

practices.  Defendants argued, and would have continued to argue, that, as a matter of law, Defendants' purported internal mismanagement and failure to disclose such mismanagement does not constitute securities fraud.  Moreover, there were no admissions by Equifax, or findings of fact by a governmental regulator, that the Company's cybersecurity was in violation of applicable regulatory or industry standards.  Thus, there was a real risk that Defendants could have convinced a jury that Equifax's alleged misstatements regarding its data security standard and practices were inactionable.

96.    Finally, Defendants argued, and would have continued to argue, that Defendant Smith's August 2017 statements at a business school breakfast and the statements on Equifax webpages do not satisfy the "in connection with" the purchase or sale of securities element needed to support a Section 10(b) claim. Defendants asserted that these alleged false and misleading statements were not material or directed at Equifax investors.  Defendants argued that these statements therefore could not form the basis of Lead Plaintiff's claims under the fraud-on-the-market theory.

### D.    The Risks of Proving Scienter

97.    Even if Lead Plaintiff were able to establish a material misrepresentation, it faced significant hurdles in proving scienter—gross

recklessness or intent to defraud.  Proving scienter in this case would have been particularly difficult for a number of reasons.

98.    First, Lead Plaintiff faced a significant hurdle in establishing that Equifax's senior management, including Defendant Smith, had direct knowledge of Equifax's cybersecurity deficiencies.  Throughout the litigation, Defendants have strenuously denied that Equifax's senior management were aware of the Company's alleged cybersecurity failures until shortly before the end of the Class Period.  Thus, Lead Plaintiff faced a significant risk in proving that either Defendant Smith or another senior officer of Equifax acted with an intent to mislead investors.  If Smith's scienter could not be established throughout the Class Period, and if Plaintiff was unable to establish Equifax's scienter through another corporate officer, its claims against the Company would also fail for failing to prove Equifax's corporate scienter.

99.    Furthermore, the difficulty of proving Defendant Smith's participation in the alleged fraud is underscored by the fact that despite Plaintiff's discovery efforts in the case and investigations by multiple prosecutors, regulators, Congress, and other private parties (in both the United States and Europe), Defendants would argue that no evidence directly linking Defendant Smith to the alleged fraud has been uncovered to date.

100.  In addition, the Company would present evidence that it invested millions of dollars in cybersecurity and had in place a reasonable overall cybersecurity program, asserting that such efforts make clear that there was no intent, or reckless disregard, to mislead investors about Equifax's actual data security practices.

**E.    The Risks of Establishing Loss Causation and Damages**

101.  Even assuming that Lead Plaintiff overcame each of the above-described risks and successfully established falsity, materiality, and scienter, it faced serious risks in proving loss causation and damages.  Indeed, a major consideration driving the calculation of a reasonable settlement amount was that Defendants would likely advance substantial challenges to each of the alleged corrective disclosures.  Had the Court accepted any of these arguments in whole or in part after the Parties presented those arguments through financial experts' analyses at class certification, summary judgment, or trial, this would have eliminated or, at a minimum, drastically limited Settlement Class Members' recovery.

102.  For example, Defendants have argued and would continue to argue that the Class Period should start later (if at all), in March 2017, and end earlier, on September 7, 2017.  According to Defendants, the Class Period should start in

March 2017 (rather than in February 2016) when Defendants are alleged to have received a report from an outside consulting firm (Mandiant) making certain observations regarding aspects of Equifax's cybersecurity program.  Defendants also claim that the Class Period should end on September 7, 2017, the date of Equifax's initial disclosure of the Data Breach, not September 15, 2017, because the alleged corrective disclosures made after the initial disclosure of the Data Breach did not disclose anything new to the market that had not already been previously revealed on September 7, 2017.  Either argument, if successful, would materially reduce the Class's damages.

103.   In addition, in attempting to establish its full amount of estimated damages, Lead Plaintiff would have to prove that losses caused by the following five separate disclosures related to the data breach, caused statistically significant price declines in Equifax common stock, when removing the effects of (a) broader industry and market factors, and (b) Equifax-specific news that did not reveal anything about the Defendants' alleged fraud:

| Trading Day | Disclosure | Residual Decline Per Common Share[6] |
|---|---|---|
| 9/8/2017 | Equifax announces that it had suffered data breach affecting information of approximately 143 American consumers | $9.67 |
| 9/11/2017 | News of state and federal government investigations | $4.45 |
| 9/13/2017 | News of the vulnerability exploited in the Equifax's Argentina facility breaks; coalition of 40 states joined together to probe Equifax's handling of the data breach | $6.78 |
| 9/14/2017 | Equifax discloses that vulnerability in the Apache Struts framework led to data breach | $0.60 |
| 9/15/2017 (prior to 12:20 pm ET) | Equifax announces retirement of Chief Information Officer David Webb and Chief Security Officer Susan Mauldin; Equifax announces nearly 400,000 UK citizens may have been impacted by data breach | $0.96 |

104.   Similar to their arguments that the Class Period should end on September 7, 2017, Defendants would have argued that the alleged fraud was fully

---

[6] Based on Lead Plaintiff' financial expert's analysis of likely maximum provable

disclosed no later than September 7, 2017; that all of the subsequent disclosures price drops could not be linked to disclosures of non-confirmatory information revealing any alleged "fraud" or deficiencies in Equifax's cybersecurity. Thus, there is a risk that the Court would cut back the Class Period to include at most only one of Plaintiff's five corrective disclosures, and that all of the stock-price declines after September 8, 2017 are therefore unrecoverable. *See In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010). If accepted by the Court on summary judgment or by a jury at trial, this argument would have drastically reduced the Class's recoverable damages. Indeed, if the initial disclosures by the Company on September 7, 2017 were found to have fully revealed the fraud, the vast majority of Lead Plaintiff's asserted damages would have been eliminated. This is reflected in the per-share inflation amounts set-forth above for the dates after September 8, 2017, which total far more than the decline on September 8. Lead Plaintiff would have argued that each of the later disclosures revealed material new information to the market concerning either the details or the severity of the fraud and caused recoverable damages, but there was

---

damages, as reflected in the proposed Plan of Allocation.

a significant risk that Lead Plaintiff's arguments would not prevail with respect to some or all of the later corrective disclosures.

105.   In addition, Defendants would argue that the full amount of the share price declines on all of the corrective disclosures dates was not recoverable, because certain of the negative information on each date was unrelated to the alleged fraud.  For example, Defendants argued that a significant portion of the declines in Equifax's stock price on the corrective disclosure dates, in particular on September 8 and September 11, reflect investors' reaction to the expected cost and impact of the data breach itself rather than the revelation of the Company's undisclosed cybersecurity deficiencies.  Defendants would also argue that the decline on September 14 was unrelated to news that the data breach involved an unpatched weakness in the Apache Struts software it used, as that information had been previously disclosed and was not "new" news.  Finally, Defendants would argue that the decline on September 15 occurred prior to the announcement of certain executive departures at the Company, and thus could not have caused the price drop on that date (in addition to arguing that such departures did not reveal anything about the alleged fraud).  These arguments, if accepted, would have significantly reduced damages.

106.   Similarly, Defendants have argued that the data breach was the materialization of a publicly-disclosed risk that Equifax's systems could be breached, and that Lead Plaintiff and members of the Settlement Class would not be entitled to recover the full decline in Equifax's stock price upon the announcement that the data breach had occurred.  This argument was substantially based on the decision in *In re BP p.l.c. Securities Litigation,* MDL No. 10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), and could have resulted in all of the class's damages being wiped out if the Court or a jury concluded that Plaintiff could not establish that there was any way of establishing class-wide damages attributable to the "risk" of a data breach being misrepresented.

107.   Defendants would also have made other arguments at summary judgment or trial that would have presented serious risks of substantially reducing any recoverable damages.   Among other things, Defendants would have challenged Lead Plaintiff's damages analysis on the ground that the analysis did not disaggregate common stock price declines caused by news concerning the alleged fraud from declines caused by other news about Equifax on the relevant days.  While Lead Plaintiff would have argued that the residual declines on the relevant days were caused entirely by the revelation of the alleged fraud, there

would have been a substantial risk that the Court or a jury would have accepted Defendants' position, reducing any recoverable damages.

108.   Finally, loss causation and damages would have been the subjects of complex analyses by competing experts for Lead Plaintiff and Defendants with the burden of proof on Lead Plaintiff, and there would have been a substantial risk that the Court or a jury would find Defendants' expert's criticisms of Lead Plaintiff's expert's analyses persuasive.

**F.    The Risks of Certifying the Class and Maintaining Class Certification**

109.   At the time the Settlement was reached, the Parties had fully briefed the motion for class certification.   In their opposition to class certification, Defendants raised various challenges to certification of the Class.   In particular, Defendants argued that that this Action was similar to *In re BP p.l.c. Securities Litigation*, where the Court found that the Lead Plaintiff tendered a damages model that awarded damages to the pre-explosion purchasers based on stock drops after the explosion and therefore overcompensated the class in the face of a known risk.   Defendants also argued that Plaintiff would be unable to put forth a damages model that measured damages on a class-wide basis.   Lead Plaintiff vigorously opposed these arguments.   However, even assuming Union successfully obtained certification, there was a risk of an interlocutory Rule 23(f) appeal or

decertification at a later stage in the proceedings based on further evidence on summary judgment or at trial.

### G.   The Risk of Appeal

110.   Even if Lead Plaintiff prevailed at summary judgment and at trial, Defendants would likely have appealed the judgment, leading to many additional months, if not years, of further litigation.   On appeal, Defendants would have renewed their host of arguments as to why Plaintiff failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiff to the risk of having any favorable judgment reversed or reduced below the Settlement Amount.

111.   The risk that even a successful trial verdict could be overturned on a post-trial motion or appeal is real in securities-fraud class actions.   *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009) (granting summary judgment to defendants after eight years of litigation), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after 19-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co*., 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In*

*re Apple Comp. Sec. Litig.*, No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (vacating $100 million jury verdict on post-trial motions).

\* \* \*

112.  Based on all the factors summarized above, Lead Plaintiff and Lead Counsel respectfully submit that it was in the best interest of the Settlement Class to accept the immediate and substantial benefit conferred by the $149 million Settlement, instead of incurring the significant risk that the Settlement Class would recover a lesser amount, or nothing at all, after several additional years of arduous litigation. Indeed, the Parties were deeply divided on several key factual issues central to the litigation, and there was no guarantee that Lead Plaintiff's positions on these issues would prevail at either class certification, summary judgment, or trial.  If Defendants had succeeded on any of these substantial defenses, Lead Plaintiff and the Settlement Class would have recovered nothing at all or, at best, would likely have recovered far less than the Settlement Amount.

## V.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

113.  The $149 million Settlement represents an excellent recovery for the Settlement Class.  It is also a very favorable result when it is considered in relation to the range of potential recoveries that might be recovered if Lead Plaintiff prevailed at trial, which was far from certain for the reasons noted above.  Lead

Plaintiff's expert estimates, after giving effect to certain of Defendants' arguments, that the maximum potential damages that could be realistically established at trial were approximately $588 million.[7]  However, proving the damages reflected in this estimate assumes that Lead Plaintiff would have prevailed on all their merits arguments about falsity, materiality, and scienter, and that all or most aspects of the case would be sustained and proven at trial.  Even so, this estimate would be subject to substantial risk at trial, as it would be subject to a "battle of the experts."  As noted above, at trial, the damages estimate could have been substantially reduced based on arguments about which alleged corrective disclosures, if any, caused recoverable damages and whether the artificial inflation, if any, of Equifax's common stock share price was constant throughout the Class Period, among other things.

114.   However, assuming that the estimated likely maximum damages were proven at trial, based on this estimate, the $149 million Settlement represents approximately 25% of likely maximum recoverable damages (before reductions for any award of attorneys' fees or reimbursement of Litigation Expenses).  In

---

[7] As noted in Lead Plaintiff' Preliminary Approval Motion, the per-share inflation amounts used to determine the $588 million likely maximum recoverable

light of the substantial risks of establishing liability and damages presented here, this recovery represents an excellent outcome for members of the Settlement Class.

115.    For all these reasons, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Settlement Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation.

## VI.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

116.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Notice") and the Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.  The Preliminary Approval Order also set a June 5, 2020 deadline for Settlement Class Members to submit

─────────────────────

aggregate damages amount are the same as those used in the proposed Plan of

objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class and set a final approval hearing date of June 26, 2020.

117.   In accordance with the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to disseminate copies of the Notice and Claim Form by mail and to publish the Summary Notice.   The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to exclude themselves from the Settlement Class.   The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Fund and for payment of Plaintiff's Counsel's Litigation Expenses in an amount not to exceed $1,000,000, including reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Settlement Class.   To disseminate the Notice, JND obtained information from Equifax and

---

Allocation (discussed in Section VII below).

from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Segura Decl."), attached as Exhibit 2, at ¶¶ 3-8.

118.   On March 24, 2020, JND mailed 7,987 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominees by first-class mail. *See* Segura Decl. ¶¶ 3-4.  Through May 20, 2020, JND disseminated 183,870 Notice Packets. *Id.* ¶ 7.

119.   On April 2, 2020, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in the *Wall Street Journal* and to be transmitted over the *PR Newswire*. *See id*. ¶ 8.

120.   Lead Counsel also caused JND to establish a dedicated settlement website, www.EquifaxSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint. *See id*. ¶ 10.  Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.blbglaw.com.

121.   As noted above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is June 5, 2020. To date, two requests for exclusion have been received.  *See* Segura Decl. ¶ 11.  In addition, to date, one objection to the Settlement has been received, and Lead Counsel is currently unaware of any objections to the Plan of Allocation or the Fee and Expense Application.  Lead Plaintiff will file reply papers in support of final approval of the Settlement on June 19, 2020, after the deadline for submitting requests for exclusion and objections has passed, and will address all requests for exclusion and objections received.

## VII. PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

122.   In accordance with the Preliminary Approval Order, and as provided in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, (iv) any attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit valid Claim Forms with all required information postmarked no later than July 22, 2020.  As provided in the

Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

123.    Lead Plaintiff's damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

124.    The Plan of Allocation is included in the mailed Notice.  *See* Notice, attached as Exhibit A to the Segura Decl., at pp. 12-16.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after trial or estimates of the amounts that will be paid to Authorized Claimants under the Settlement.  Instead, the calculations under the Plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

125.    In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of alleged artificial inflation in the per share closing prices of Equifax common stock that was allegedly proximately caused by

Defendants' alleged materially false and misleading statements and omissions. In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiff's damages expert considered price changes in Equifax common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces, other negative information unrelated to Lead Plaintiff's allegations, and to account for the strength of Lead Plaintiff's claims, including potential difficulties in proving loss causation. *See* Notice ¶ 57.

126.   Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of publicly-traded Equifax common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided. The calculation of Recognized Loss Amounts will depend upon several factors, including: (a) when the shares of publicly-traded Equifax common stock were purchased or otherwise acquired, and at what price; and (b) whether the Equifax common stock shares were sold or held through the end of the Class Period or the 90-day look-back period under the PSLRA, and if the shares were sold, when and for what amounts. *Id.* ¶¶ 59-61.

127.   Claimants who purchased and sold all their shares of publicly-traded Equifax common stock before the first corrective disclosure, or who purchased and sold all their shares between two consecutive dates on which artificial inflation was allegedly removed from the price of Equifax common stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions

128.   Under the Plan of Allocation, the sum of a Claimant's Recognized Loss Amounts for all their purchases of publicly-traded Equifax common stock during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims.  *Id.* ¶¶ 62, 71-72.  Once the Claims Administrator has processed all submitted claims it will make the *pro rata* distributions to eligible Class Members, until additional re-distributions are no longer cost effective.  *Id.* ¶ 74.  At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court.  *Id.*

129.   In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class

Members based on the losses they suffered on transactions in publicly-traded Equifax common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

130. As noted above, through May 20, 2020, 183,870 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members. S*ee* Segura Decl. ¶ 7. To date, no objections to the proposed Plan of Allocation have been received.

## VIII. THE FEE AND EXPENSE APPLICATION

131. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of Plaintiff's Counsel, for an award of attorneys' fees in the amount of 20% of the Settlement Fund, net of Court-approved Litigation Expenses (the "Fee Application"). Lead Counsel also requests payment for expenses that Plaintiff's Counsel incurred in connection with the prosecution Action from the Settlement Fund in the amount of $659,925.13 and reimbursement to Lead Plaintiff Union in the amount of $121,375.00 for costs and expenses that it incurred directly related to its

representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4) (collectively, the "Expense Application").

132.   The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

133.   For the efforts of Plaintiff's Counsel on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.   As discussed in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the Settlement Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the U.S. Supreme Court and the Eleventh Circuit Court of Appeals for cases of this nature.

134.   Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.   As discussed in the Fee

Memorandum, a 20% fee award is less than the 25% benchmark for attorneys' fees in the Eleventh Circuit for common-fund cases such as this, and given the facts and circumstances of this case, is well within the range of percentages awarded in securities class actions in this Circuit and elsewhere in comparable settlements.

### 1. Lead Plaintiff Has Authorized and Supports the Fee Application

135. Lead Plaintiff Union is a sophisticated institutional investor that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Riechwald Decl. ¶¶ 3-9. Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested, which is consistent with the fee agreement entered into by Union and Lead Counsel at the outset of the litigation. *Id.* at ¶¶ 11-13. After the agreement to settle the Action was reached, Lead Plaintiff reviewed the proposed fee and believes it is fair and reasonable in light of the outstanding result obtained for the Settlement Class, the excellent work performed by Plaintiff's Counsel, and the risks undertaken by counsel. *Id.* at ¶ 11. Lead Plaintiff's endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Time and Labor Devoted to the Action by Plaintiff's Counsel

136. As defined above, Plaintiff's Counsel are the Court-appointed Lead Counsel BLB&G and Bondurant Mixson & Elmore LLP ("BME"), local counsel for Lead Plaintiff and the Class.

137. As described above in greater detail, the work that Plaintiff's Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly-available documents such as SEC filings, analyst reports, conference call transcripts, press releases, news articles, social media posts, and other publicly available sources of information concerning Equifax; (ii) drafting the detailed 186-page Consolidated Complaint asserting violations of the Exchange Act against Defendants; (iii) successfully moving to modify the PSLRA discovery stay; (iv) successfully defeating Defendants' joint motion to dismiss the Complaint, in large part, through briefing and oral argument; (v) successfully opposing Defendant Equifax's motion for clarification on the Court's motion to dismiss order and Defendants' joint motion to certify questions related to the Court's order for interlocutory review pursuant to 28 U.S.C. 1292(b); (vi) successfully moving to modify the PSLRA discovery stay; (vii) preparing and filing Lead Plaintiff's motion for class certification, which included the submission an expert report on market efficiency

and the availability of class-wide damages methodologies, defending the depositions of Lead Plaintiff's representatives and expert, deposing Defendants' expert, and the submission of a rebuttal expert report; (viii) undertaking substantial fact discovery efforts, including producing over 28,150 pages of documents from Lead Plaintiff, drafting and serving extensive discovery requests on Defendants and document subpoenas upon several dozen relevant nonparties, responding to document requests served by Defendants, serving and responding to interrogatories and litigating discovery disputes, and reviewing and analyzing over 1 million pages of documents produced by Defendants and third parties; (ix) consulting extensively throughout the litigation with experts regarding loss-causation, damages, and cybersecurity issues; (x) engaging in extensive, arm's-length settlement negotiations to achieve the Settlement, including an all-day, in person mediation session; and (xi) drafting and negotiating the Settlement Stipulation and related settlement documentation.

138.    Throughout the litigation, I maintained control of and monitored the work performed by other lawyers at BLB&G on this case.  Specifically, most of the major tasks in the case—drafting sections of each pleading, discovery motion, or discovery request or response, negotiating particular discovery issues with Defendants or third parties—were handled primarily by me with the assistance of

one of the other lawyers on the team. I personally handled presentations to the Court at several status conferences and hearings, client communications, strategy meetings, and was involved in all aspects of the settlement process. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of the Action.

139. Attached hereto as Exhibits 3A and 3B, respectively, are my declaration on behalf of BLB&G and the declaration of H. Lamar Mixson on behalf of Bondurant Mixson & Elmore LLP, in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred, delineated by category. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. In addition, each of the Fee and Expense Declarations includes summary descriptions of the principal tasks performed by each attorney and principal support staff involved in this Action. The Fee and Expense Declarations were prepared from

contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court. The first page of Exhibit 3 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiff's Counsel's firm, and gives totals for the numbers provided.

140.    As set forth in Exhibit 3, Plaintiff's Counsel expended a total of 42,231.25 hours in the investigation, prosecution, and resolution of this Action through May 15, 2020. The resulting lodestar is $18,633,444.50. The vast majority of the total lodestar—97%—was incurred by Lead Counsel. Lead Counsel has and will continue to invest substantial time and effort in this case after the May 15, 2020 cut-off imposed for their lodestar submissions on this application.

141.    If the Court awards Plaintiff's Counsel's Litigation Expenses, the requested fee of 20% of the Settlement Fund, net of expenses, represents $29,643,739.97 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 1.59 of Plaintiff's Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier is well within the range of fee multipliers typically awarded in

comparable securities class actions and in other class actions involving significant contingency-fee risk, in this Circuit and elsewhere.

### 3.    The Experience and Standing of Lead Counsel

142.    As demonstrated by the firm résumé attached as Exhibit 3A-3 hereto, BLB&G is among the most experienced and skilled law firms in the securities-litigation field, with a long and successful track record representing investors in cases of this kind, and is consistently ranked among the top plaintiffs' firms in the country.   Further, BLB&G has taken complex cases like this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.   I believe that this willingness and ability to take cases to trial added valuable leverage during the settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

143.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.   Here, Defendants Equifax, Gamble, Ploder, and Dodge were represented by King & Spalding LLP, one of the country's most prestigious and experienced defense firms, which vigorously represented its clients.   Defendant Smith was defended by similarly prestigious and experienced firms, Quinn Emanuel Urquhart & Sullivan LLP and Troutman Sanders LLP.   In the face of this experienced, formidable, and

well-financed opposition from some of the nation's top defense firms, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are highly favorable to the Settlement Class.

### 5. The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

144. The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

145. From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel

received no compensation during the course of the Action and have incurred nearly $650,000 in expenses in prosecuting the Action for the benefit of the Settlement Class.

146.   Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent efforts, success in contingent-fee litigation like this is never assured.

147.   Lead Counsel knows from experience that the commencement and prosecution of a class action do not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

148.   Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors,

particularly institutional investors, take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

149.   Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In these circumstances and in consideration of the hard work and the excellent result achieved, I believe that the requested fee is reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

150.   As stated above, through May 20, 2020, more than 183,000 Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Fund.  *See* Segura Decl. ¶ 7.  In addition, the Court-approved Summary Notice was published in the *Wall Street Journal* and transmitted over the *PR Newswire*.  *Id.* ¶ 8.  To date, no objections to the request for attorneys' fees have been received.  Should any objections be submitted, they will be addressed in Lead Counsel's reply papers to be filed on June 19, 2020, after the deadline for submitting objections has passed.

151.   In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.  Based on the outstanding result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 20% of the Settlement Fund, net of expenses, resulting in a lodestar multiplier of approximately 1.59, is fair and reasonable, and is supported by the fee awards that courts have granted in other comparable cases.

### B.   The Litigation-Expense Application

152.   Lead Counsel also seeks payment from the Settlement Fund of $659,925.13 in litigation expenses that were reasonably incurred by Plaintiff's Counsel in commencing, litigating, and settling the claims asserted in the Action.

153.   From the outset of the Action, Plaintiff's Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Plaintiff's Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action, and any

attorneys' fee percentage awarded to Plaintiff's Counsel would be net of any awarded expenses. Consequently, counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case

154. As shown in Exhibit 3 hereto, Plaintiff's Counsel have incurred a total of $659,925.13 in Litigation Expenses in prosecuting the Action. The expenses are summarized in Exhibit 4, which identifies each category of expense, *e.g.*, expert fees, costs for maintaining the document database, online research, mediation fees, travel costs, and photocopying expenses, and the amount incurred for each category. These expense items are incurred separately by Plaintiff's Counsel, and these charges are not duplicated in counsel's hourly rates.

155. Of the total amount of Plaintiffs' Counsel's expenses, $339,483.36, or approximately 51%, was incurred for the retention of experts. As noted above, Lead Counsel consulted with experts in the fields of loss causation and damages during its investigation and the preparation of the Complaint, and consulted further with one of those experts during the settlement negotiations with Defendants and the development of the proposed Plan of Allocation. Lead Counsel also retained cybersecurity experts, who provided consulting services

with respect to Equifax's statements regarding cybersecurity and the Data Breach and Lead Plaintiff's allegations regarding the same.

156.    Another large component of the Litigation Expenses for which payment is sought consists of discovery/document management costs, which amount to $137,968.67, or approximately 21% of the total expenses.

157.    Another significant expenditure in this Action was for online legal and factual research, which was necessary to prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, motion for clarification, and motion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), as well as to draft the motion to partially life the PSLRA discovery stay and to litigate discovery disputes, including briefing a motion to compel.    The charges for online research amounted to $57,456.79, or approximately 9% of the total amount of expenses.

158.    Also, Lead Plaintiff's share of the mediation costs paid to Phillips ADR for the services of Judge Phillips were $45,182.00, or approximately 7% of the total expenses.

159.    The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely passed on to clients billed by the hour.    These expenses include, among others, court fees,

costs of out-of-town travel, service of process expenses, copying costs, telephone charges, and postage and delivery expenses.

160.  All of the Litigation Expenses incurred by Plaintiff's Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by Lead Plaintiff.  *See* Riechwald Decl. ¶ 12.

161.  Additionally, Lead Plaintiff Union seeks reimbursement of the reasonable costs and expenses that it incurred directly in connection with its representation of the Settlement Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum. Lead Plaintiff seeks reimbursement of $121,375.00 for the time expended in connection with the Action by Dr. Carsten Fischer, General Counsel of Union, and Jochen Riechwald, Assistant General Counsel of Union, among other Union employees.  Among other things, Dr. Fischer and Mr. Riechwald spent a substantial amount of time communicating with Lead Counsel; reviewing and commenting on pleadings and motion papers filed in the Action; gathering and producing documents in response to discovery requests; preparing for, traveling to, and attending their depositions in the Action, and consulting with Lead Counsel regarding the settlement negotiations.  *See* Riechwald Decl. ¶ 6.

162.  The Notice informed potential Class Members that Lead Counsel would be seeking payment of Litigation Expenses in an amount not to exceed $1,000,000, which might include an application for the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Settlement Class.  Notice ¶¶ 5, 77.  The total amount requested, $781,300.13, which includes $659,925.13 for the litigation expenses of Plaintiff's Counsel and $121,385.00 for costs and expenses incurred by Lead Plaintiff, is significantly below the $1,000,000 that Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

163.  The expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be paid in full from the Settlement Fund.

164.  Attached to this Declaration are true and correct copies of the following documents previously cited in this Declaration:

Exhibit 1:    Declaration of Jochen Riechwald, Assistant General Counsel of Union Asset Management AG, in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses

Exhibit 2:    Declaration of Luiggy Segura Regarding:  (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

Exhibit 3:    Summary of Plaintiff's Counsel's Lodestar and Expenses

Exhibit 3A:  Declaration of James A. Harrod in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP

Exhibit 3B:  Declaration of H. Lamar Mixson in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Bondurant, Mixson & Elmore LLP

Exhibit 4:    Breakdown of Plaintiff's Counsel's Expenses by Category

Exhibit 5:    Cornerstone Research, *Securities Class Action Settlements 2019 Review and Analysis* (2020)

Exhibit 6:    Cornerstone Research, *Securities Class Action Filings 2019 Year In Review* (2020)

## IX.    CONCLUSION

165.   For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 20% of the Settlement Fund, net of expenses, should be approved as fair and reasonable, and the requests for payment of Plaintiff's Counsel's expenses in the amount of $659,925.13 and reimbursement

of Lead Plaintiff's costs and expenses in the amount of $121,375.00 should also be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, this 22nd day of May, 2020.

_____*/s/ James A. Harrod*_____
James A. Harrod